AETNA PORTLAND CEMENT CO. et al. v. FEDERAL TRADE COMMISSION.

CEMENT INSTITUTE et al. v. SAME and ten other cases.

Nos. 8360, 8361, 8371–8373, 8386, 8389, 8393, 8399, 8402, 8409, 8410.

Circuit Court of Appeals, Seventh Circuit. Sept. 20, 1946.

EVANS, Circuit Judge, dissenting.

Donovan Leisure Newton Lumbard & Irvine and William J. Donovan, George S. Leisure, James R. Withrow, Jr., Ira C. Werle, and Henry Herrick Bond, all of New York City, William G. Compton, of

Keeseville, N. Y., and Dorr Casto and Breck P. McAllister, Thomas J. McFadden and Francis A. Brick, all of New York City, George Ragland, Jr., of Chicago, Ill., Edward K. Hanlon, of New York City (Murray T. Quigg, Joseph A. Seeley, and Francis X. Walsh, all of New York City, of counsel), for petitioners Aetna Portland Cement Co., Cement Institute and Blaine S. Smith et al.

Edward A. Zimmerman, Harold W. Norman, William R. Engelhardt, and Zimmerman and Norman, all of Chicago, Ill., and Roscoe Pound, of Cambridge, Mass., for petitioner Marquette Cement Mfg. Co.

Walter C. Fox, Jr., Marshall P. Madison, Herbert W. Clark, and Chickering & Gregory, Pillsbury, Madison & Sutro, Morrison, Hohfeld, Foerster, Shuman & Clark, all of San Francisco, Cal., A. W. Witherspoon, and Witherspoon, Witherspoon & Kelley, all of Spokane, Wash., and Chaffee E. Hall, Robert H. Gerdes, and Earl & Hall & Gerdes, all of San Francisco, Cal., and Overton, Lyman, Plumb, Prince & Vermille, and Edward D. Lyman, all of Los Angeles, Cal., for petitioner Calaveras Cement Co. et al.

Charles Wright, Jr., and Laurence A. Masselink, both of Detroit, Mich., for petitioner Huron Portland Cement Co.

Francis A. Le Sourd and Little, Leader, Le Sourd & Palmer, all of Seattle, Wash., for petitioner Superior Portland Cement, Inc.

S. Harold Shefelman and Weter, Roberts & Shefelman, all of Seattle, Wash., for petitioner Northwestern Portland Cement Co.

Louis W. Myers and Pierce Works, both of Los Angeles, Cal. (O'Melveny & Myers, and Lauren M. Wright, of Los Angeles, Cal., of counsel), for petitioner Riverside Cement Co.

John H. Hershberger, Elbridge H. Condee and Knapp, Cushing, Hershberger and Stevenson, all of Chicago, Ill., Nathan L. Miller, of New York City, and Roger M. Blough, of Pittsburgh, Pa., for petitioner Universal Atlas Cement Co.

Robert B. Murphey and Alex W. Davis, both of Los Angeles, Cal., for petitioner California Portland Cement Co.

William D. Burnett, of Los Angeles, Cal., for petitioner Monolith Portland Cement Co. et al.

William T. Kelley, Chief Counsel, and Walter B. Wooden and Everette MacIntyre, Assts. Chief Counsel, Federal Trade Commission, all of Washington, D. C., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These are petitions, joint and several, filed on behalf of the Cement Institute, 74 cement producers and 23 individuals, officers and agents of the Institute, for review of and to set aside or modify an order to cease and desist issued by the Federal Trade Commission July 17, 1943, against the petitioners (respondents before the Commission and referred to in this opinion as such).

Nine separate briefs have been filed in this court on behalf of respondents, seven singly by seven of the corporate respondents in Nos. 8371, 8373, 8386, 8389, 8393, 8399 and 8402. One brief has been filed on behalf of 59 corporate respondents, No. 8360, the Cement Institute and certain officials thereof, No. 8361, and certain other officers and agents of the Institute, No. 8410. Another brief has been filed on behalf of seven of the corporate respondents, No. 8372. In No. 8409, the corporate respondents rely upon the points made by Aetna, et al. in No. 8360. These briefs comprise a total of about 775 printed pages. In reply, the Commission has filed a brief of more than 300 pages. Reply briefs have been filed by respondents with a total of about 444 pages. In addition, respondents have filed what is designated as Appendix A, consisting of four volumes containing a voluminous digest or statement of facts. This court heard oral argument for three days, April 30, May 1 and May 2, 1946. This argument was reported, transcribed and furnished to the court in a volume which totals more than 550 pages.

Some twenty pages of the Commission's findings are devoted to the naming of the corporate respondents and a narration of

certain information pertaining to each. So far as here material, such information has to do with the naming of the State of incorporation of each corporate respondent, the location of its place of business as a producer of cement, the date when each became a member of the Institute, and the period during which it continued as such. The corporate respondents are located in thirty-six different States, in fact in all portions of the United States. Eleven of such respondents are located in Pacific Coast States west of the Rocky Mountains.

The Commission's complaint consists of two counts, both charging that "for more than eight years last past, respondents have maintained and now have in effect a combination among themselves to hinder, lessen, restrict and restrain competition in price, among producing respondents * * * made effective by mutual understanding or agreement to employ, and by the actual employment of * * * what is known as a multiple basing point system of pricing," which results in the quoting of an identical delivered price by all producers who seek business at any given destination. This combination is alleged to be an unfair method of competition, in violation of Sec. 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 46.

Count 1, under a heading entitled "Methods for making system effective," enumerates other practices and means used cooperatively in pursuance of and in support of the alleged combination, as follows: (1) an agreement to determine prices by using freight rates contained in freight rate books prepared and distributed by the Institute, regardless of the accuracy of such rates and with the alleged result that official tariffs are nullified; (2) an agreement to eliminate diversions of cement in transit, which allegedly result in concessions in delivered prices to the transferees; (3) an agreement to thwart the efforts of the Federal government to secure f.o.b. mill prices on cement; (4) an agreement arbitrarily to classify customers and to sell only to middlemen who fall within an "agreed and arbitrary definition of a 'cement dealer'"; (5) mutual understanding and concerted action to use uniform terms of sale and discounts; (6) an agreement to prevent price competition resulting from the sale of foreign cement, and (7) the interpretation and formulation by the Institute of official policies for the industry where individual action might result in breaking down the pricing system.

Count 2 charges that delivered prices made pursuant to the combination as alleged in count 1 are not actual prices received because they include the cost of transportation; that the true prices of each seller are the amounts realized at the mill (called "mill nets") after deduction of such transportation costs; that the variations in such mill nets have resulted from the alleged combination to use the "multiple basing point system" and constitute discriminations in price by each seller among his customers; and that the effect is to injure, destroy and prevent competition in price among producing respondents in violation of Sec. 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13.

It will thus be noted that the restraint on competition alleged in both counts of the complaint is between producing respondents and that the discriminations alleged in count 2 are among the customers of each seller. In other words, there is no allegation of restraint on competition between customers, and no allegation of discriminations between customers of different producing respondents.

Answers were filed by all respondents, denying all allegations of the complaint as to understanding, agreement or combination. Many of the answers also set forth various affirmative defenses predicated upon their individual practices and policies.

From December 1, 1937 until November 29, 1940, with some short intervals, evidence was taken before a trial examiner appointed by the Commission. This evidence consists of about 49,000 pages of oral testimony and over 50,000 pages of exhibits. The trial examiner filed his report on the evidence in May 1941, to which exceptions were filed by respondents. Briefs were filed and oral argument was had before the Commission in April and May 1942. On July 17, 1943, the Commission entered its findings and conclusions, which cover 171 pages of the printed

record. It also entered its Order to Cease and Desist and certain ancillary orders denying motions theretofore made by the respondents. The petitions to review and set aside the Commission's order were filed in this court July 26, 1943. Pursuant to extension of time granted, respondents on March 20, 1944 filed their statement of points and a motion to adduce additional evidence. By order of this court dated July 31, 1944, the motion to adduce additional evidence was denied, without prejudice to its being renewed at the time of hearing on the merits.

The contested issues are stated by the respective parties in numerous and divers ways. They present questions both factual and legal. We think the fundamental issue under count 1 of the complaint may be divided into two parts, (1) whether the Commission has found that respondents have entered into a nation-wide conspiracy, as charged, to restrain competition in price in the sale of cement by use of the multiple basing point system of pricing, in violation of Sec. 5 of the Federal Trade Commission Act, and (2) whether such finding, if made, is substantially supported by the record and constitutes a violation of law.

Under count 2, the issue appears to be whether the combination or conspiracy alleged in count 1, if found to exist, resulted in variances in the mill net prices of the respective corporate respondents and variances in their respective delivered price quotations not accounted for by differences in the respective costs of delivery, thereby constituting unlawful discriminations in price between customers of the same corporate respondent under Sec. 2 of the Clayton Act as amended.

Numerous other issues are raised by reason of respondents' contentions (1) that the Commission committed prejudicial error in the reception of evidence upon which its findings were in whole or in part predicated, as well as in the rejection of evidence; (2) that the order to cease and desist exceeds the jurisdiction of the Commission and should be set aside for that reason, and (3) that the decision of the Supreme Court in Cement Mfrs. Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (generally referred to as the old Cement case), makes res adjudicata or is otherwise determinative of the issues relevant to count 1 of the complaint. The issues just stated are common to all of the respondents.

Certain other issues are raised which are pertinent only to some of the respondents. Such issues include (1) that assuming that a nation-wide conspiracy has been found as charged, there is neither finding nor proof that certain of the respondents were members thereof; (2) that respondents have been deprived of the constitutional rights of due process of law because of the bias and prejudice of the Commission and its pre-judgment of the case, and (3) that the Commission is without jurisdiction as to certain respondents because their sales of cement were made solely within the State in which their mills are located and they are in no manner engaged in interstate commerce.

At this point it seems pertinent to make a general statement relative to the cement industry. Cement is a binding agent which, when mixed through the agency of water with sand, stone or other such ingredients, produces concrete or mortar. It is a perishable product which cannot readily be stored and is therefore produced and purchased by the user as needed. The location of cement mills is determined primarily by availability of raw materials, but sources of fuel, prospective demand and proximity and access to markets are also considered. The first mill for the commercial manufacture of cement in this country was established in Pennsylvania some seventy years ago. Prior to that time cement was imported from abroad. Subsequently, its manufacture gradually spread until there are now cement producing plants located in at least thirty-six States. On the date of the complaint, July 2, 1937, the 74 producing respondents were operating 144 cement mills and 19 packing plants. Such mills in all but a few instances are located at the site of the primary raw material, that is, limestone or shale. Some mills, however, are located with reference to the source of fuel. Packing plants are invariably located at or near large points of consumption, and bulk cement is shipped by

water in large quantities to these points for packing and sale. Numerous maps found in the record show that there are several areas where a number of mills are grouped in close proximity to each other.

Cement is not marketed on a national scale. As found by the Commission (Par. 3(a))[1]: "Cement is a heavy and bulky commodity and the cost of transporting it from point of manufacture to point of use generally constitutes a substantial part of the delivered cost. Freight charges of 30¢ to 60¢ per barrel for delivery are quite usual, charges approximating $1 per barrel are not uncommon, and in extreme instances the delivery charges sometimes reach amounts such as $1.33, $1.52, and $1.71 per barrel. The high transportation cost constitutes one of the factors which have contributed to the extension of the manufacture of cement throughout the United States." The marketing area of each mill is thus limited by freight and competitive price factors, and most mills sell the bulk of their output within a radius of not more than two to three hundred miles from the mill.

Cement is used largely in the construction of permanent structures. This accounts for the fact, no doubt, that there is little if any competition between the users of cement and, as we have already noted, the competition alleged to be restrained is confined to that between producers, and the discrimination between customers of the same producer. As to the use made of cement, finding 3(b) states: "Cement is used in street and highway construction, in water power, irrigation, and flood control works, in most heavy construction work, in general building, in various public projects, in the production of blocks, pipes, and other products, and in many other ways. In some of these uses cement constitutes a very substantial part of the total cost of all materials used in the project."

Cement perhaps more than any other product is highly standardized. This was recognized in the old Cement case, wherein the court stated (268 U.S. at page 591, 45 S.Ct. at page 586, 69 L.Ed. 1104): "Cement is a thoroughly standardized product." This fact is also recognized by the Commission. Finding 20(b) states: "For many years the minimum specifications for portland cement have been standardized and all cement has been sold subject to such minimum specifications." The record discloses that minimum standards for cement have been steadily increased since standard specifications were introduced by the American Society of Civil Engineers and the American Society for Testing Materials in 1904. While the Commission has found that cement produced by some mills has exceeded the minimum specifications, the record discloses without controversy that buyers will not pay more for one brand than another, regardless of variations above the minimum standards. In other words, it is an interchangeable product and, as some of the witnesses stated, "Cement is cement." In the complaint it is alleged, " * * a difference in delivered price of only one cent (1¢) a barrel will deflect business away from one manufacturer to another." Finding 9(a) states: "A difference in price as small as one cent per barrel may divert business from one seller to another." The Commission in its brief states:[2] " * * * a difference of only a fraction of a cent per barrel on sealed bids for large Government orders will ordinarily determine the award."

Cement is usually packaged in paper or cloth bags containing 94 pounds each, and when thus packaged four bags constitute a barrel of cement, the gross weight of which is 380 pounds. As found by the Commission (3(c)): "Manufacturers customarily market cement by sales to dealers for resale * * *. In periods of normal business, sales to dealers constitute the most important channel of distribution * * *." This finding goes on to point out that dur-

---

[1] The Commission's findings are arranged in paragraphs designated by numbers. Some of the paragraphs contain numerous sub-paragraphs which are designated by letters. Hereafter, in referring to a finding, the numeral will indicate the paragraph and the letter the sub-paragraph.

[2] Hereafter, when quoting the Commission, it will be from its brief filed in this court unless otherwise noted.

ing the depression years of 1930 to 1937, sales were made to governmental agencies on a large scale.

There are some 30,000 dealers located in cities, towns and hamlets throughout the country. Each dealer is free to handle several brands of cement if he chooses; in fact, most of them handle several, and substantially all handle more than one. The Commission concedes that dealers are the "backbone" of the business. There is voluminous evidence in support of respondents' assertion that dealers are practically unanimous in their desire to purchase on a destination price basis. The Commission does not dispute this assertion; in fact, it substantially corroborates it. Finding 7(a) states: "Substantially all sales of cement by the corporate respondents are made on the basis of a delivered price; that is, at a price determined by the location at which actual delivery of the cement is made to the purchaser." Commission's counsel stated before the examiner: "If there is anything that I think has been shown in this case over and over again, and shown by us, it was the usual method of requesting business on a destination basis." The reason buyers are so insistent that cement be sold at a destination price is their desire to know how much it will cost them delivered. This is especially true of contractors who use large amounts of cement. The difficulty otherwise confronting the buyer who wants to know the cost at delivery is that he is required to figure the complicated railroad tariffs which constitute a material part of such cost. There is also much evidence to the effect that producers of cement, in common with producers generally, are dependent upon the favor of their customers and must establish their sales policies so as to meet their approval. All cement, however, was not sold on a delivered price basis. Some was sold on an f.o.b. plant basis, and the Commission made no finding of a refusal on the part of respondents to sell on the latter basis.

### The Duration of the Alleged Conspiracy.

The complaint fixed no time as to the inception of the alleged conspiracy but merely alleged its existence "for more than eight years." The complaint was filed July 2, 1937, and the Institute was organized in August 1929. Evidently it was intended to fix the inception of the conspiracy charged at a time prior to the organization of the Institute. In fact, the case appears to have been tried upon the theory that the conspiracy had been in existence for as long as thirty-five years. Respondents assert that upon the filing in this court of the Commission's brief they learned for the first time that it was the Commission's position that the conspiracy charged came into existence with the organization of the Institute. Undoubtedly this assertion is sustained by the record and the Commission's brief. The Commission states: "Each of the corporate petitioners [respondents] * * * for a substantial period of time, directly associated itself with and constituted a part of the combination through membership in the Institute * * *." At another point: "The conspiracy charged was against the Institute and its members. It is what they did during the existence of the Institute that constituted the conspiracy and the order to cease and desist is directed only against those things." Referring to the Institute, the Commission further states: "It is the chief common bond which united them, the common purpose which is the core of every conspiracy." Again the Commission states: "The findings as to their Institute membership are sufficient to make them responsible for the Institute's program."

It appears rather plain that the Commission first took a definite stand as to the time of the inception of the conspiracy when confronted with respondents' contention that the old Cement case was res adjudicata of the issues here involved, and that the Commission improperly considered evidence as to the practices and customs of the cement industry prior to the organization of the Institute. In reply to respondents' contention in this respect, the Commission states: "As stated elsewhere we rely upon the acts of the Institute and its members since 1929 and upon our right to rebut petitioners' [respondents'] claim and evidence that the system was the by-product of normal competitive evolution in prior years."

### The Order to Cease and Desist.

The order is directed against the Institute, its officers and agents, and 74 corporate respondents.[3] It enjoins respondents:

" * * * from entering into, continuing, cooperating in, or carrying out any planned common course of action, understanding, agreement, combination, or conspiracy between and among any two or more of said respondents, or between any one or more of said respondents and others not parties hereto, to do or perform any of the following things:

"1. Quoting or selling cement at prices calculated or determined pursuant to or in accordance with the multiple basing-point delivered-price system; or quoting or selling cement pursuant to or in accordance with any other plan or system which results in identical price quotations or prices for cement at points of quotation or sale or to particular purchasers by respondents using such plan or system, or which prevents purchasers from finding any advantage in price in dealing with one or more of the respondents against any of the other respondents.

"2. In connection with or in aid or support of any plan, system, acts, or practices prohibited in paragraph 1 above [then follow sixteen injunctive paragraphs which we summarize in footnote[4]].

"3. Discriminating in price between or among their respective customers by systematically charging and accepting mill net prices which differ by the amounts necessary to produce delivered costs to purchasers identical with delivered costs available to such purchasers through purchases from other respondents.

"4. Using any means substantially similar to those specifically set out in this order with the purpose or effect of accomplishing any of the things prohibited by this order."

We set forth the order at this point for the purpose of clarifying a somewhat confused situation as to the precise objective of this proceeding. The order leaves no room for doubt but that the purpose of the Commission is to outlaw not only the multiple basing point price system but any and all price systems which permit the selling of cement "pursuant to or in accordance with any other plan or system," which results in identical prices or which prevents purchasers from buying from one producer at a less price than from another. The order further makes plain that it is the purpose of the Commission to require each producer to sell cement on an f.o.b. mill price basis. The numerous other acts enjoined (see footnote 4) are practices which the complaint alleges were utilized for the purpose of making effective the multiple basing

---

[3] There originally were 75 corporate respondents but the order directs that the case be closed as to respondent Castalia Portland Cement Company.

[4] (a) Refusing to sell f. o. b. mill; (b) refusing, when selling f. o. b. mill, to allow purchasers to provide any means of transportation to any place they desire; quoting or selling cement: (c) (d) at f. o. b. mill prices adjusted to equalize differences in freight from other differently located mills, (e) at delivered prices equivalent to the price base plus common carrier transportation charges from any point other than the actual shipping point, (f) at delivered prices which "systematically" include common carrier transportation factors, greater or less than the actual costs thereof from the shipping point to destination, (g) at delivered prices which "systematically" include a freight factor representing common carrier transportation charges higher than the transportation actually employed, (h) at destination cost figures with the requirement that for invoicing purposes, the f. o. b. mill price shall be determined by specified deductions, (i) to any Government Agency so as to deprive the Government of any part of the benefit of land grant or other special common carrier rates; (j) collecting, circulating, or exchanging information concerning common carrier transportation charges to be used as a factor in pricing; (k) attempting to control the destination or use of cement after the acquisition of title by the purchaser; (l) determining or using any basis of classifying customers; (m) determining the types of projects or purchasers to whom sales will or will not be made direct; (n) collecting and circulating or exchanging statistical data which reveal the individual production, stocks, sales, or shipments of any producer; (o) spying upon or threatening to boycott customers who deal in imported cement; (p) determining discounts and other terms of sale.

point system and are referred to by the Commission as acts of implementation. In other words, the order enjoins not only the use of a multiple basing point price system but all acts and practices in aid or support of such system. It is evident, so we think, that if the record fails to disclose the alleged combination or if its use be not illegal, the acts and practices alleged to support such system become immaterial.

Moreover, paragraph 3 of the order appears to be directed against respondents in their individual capacity, thereby ignoring the charge of combination or conspiracy. As we understand the Commission's argument, it so concedes. It states: "Paragraph 3 is by its nature applicable only to the respective corporate petitioners [respondents], but to a practice which to the extent used by all would in effect recreate the system and have the same effect in making delivered prices identical." If our construction of this paragraph is correct, it means that the charge of combination is little more than a pretense to get all the members of the industry, leaders and followers alike, into the same proceeding and before the same court. Further, this paragraph would prohibit each individual respondent from absorbing freight even though done in good faith to meet an equally low price of a competitor. That this is the Commission's purpose is in effect conceded. In response to criticism directed at this paragraph by respondents the Commission states: "This case will have been litigated in vain if petitioners' [respondents'] views prevail on this subject, even though other provisions of the order were to stand."

### The Cement Institute.

The Cement Institute (hereinafter referred to as the Institute) is a voluntary unincorporated trade association. It was organized in August 1929 by fourteen cement producers located in the northeastern part of the United States. As found by the Commission, its purpose was the promotion of the mutual interests of its members, and it has functioned through its officers, trustees, committees, and other agents. Its membership increased to forty by June 1930, but such membership had declined to twenty by May 1931. Its membership remained stationary until June 1933 when a campaign was inaugurated to obtain members so as to make the Institute the representative of the industry in order to comply with the N.I.R.A. in the submission of a proposed code. Under these circumstances, substantially all cement producers joined the Institute. At the time of the issuance of the complaint in the instant proceeding there were seventy-six members, representing about 95% of the productive capacity of the industry. Finding 5 states: "During a period of about 18 months beginning in November 1933, when partial self-government for the cement industry was authorized under the terms of the National Industrial Recovery Act, the Institute was the repository of the authority delegated and through its control of the Code Authority controlled the administration of the Code for the Cement Industry * * *."

### Has the Commission Found the Combination Alleged in Its Complaint.

This brings us to the highly controverted issue as to whether the findings sustain the charge of combination alleged in the complaint and therefore the order under review. Closely related is the further issue as to whether the findings, even though sufficient, are supported by substantial evidence. In connection with the combination charged it is important to keep in mind that the Commission no longer relies upon a combination existing "for more than eight years last past," but upon a combination which had its inception in August 1929 when the Institute was organized. As already noted, the findings are extremely lengthy, and we might add complicated, and difficult to comprehend. It is asserted and reasserted by respondents that the findings are vague, ambiguous, indefinite, uncertain, that there is no finding of the combination relied upon, and further that many of the findings are predicated upon incompetent testimony. It is especially emphasized by many of the respondents that assuming the combination charged to have been found, there is no finding which discloses how or in what manner they became or were members thereof. After a long and careful study

of the situation, we are very definitely of the view that there is much merit in the criticism directed at the findings, notwithstanding the vigorous defense interposed by the Commission.

As already shown, it is the Commission's contention that the Institute was "the chief common bond which united them," and the fact of membership alone is sufficient "to make them responsible for the Institute's program." As already shown, the Institute was organized in 1929, and findings 1(a) to (z), (2a) to (2z), (3a) to (3z), and (4a) fix the dates when each corporate respondent became a member. We have already shown the number of members at the beginning, as well as the increase and decline in such membership up to the time of the filing of the complaint. From what has been shown, it definitely appears that of the respondents who were members when the complaint was filed, thirty-nine had never been members prior to the N.I.R.A. period, and fifty-nine had not been members for at least two years prior thereto.

Numerous of the findings are predicated upon statements and activities of the Institute and its members during the N.I.R.A. period, as well as testimony of what happened in the industry long prior to the organization of the Institute, now referred to as background testimony, which together with certain other testimony respondents challenge as incompetent. Some of this alleged incompetent testimony upon which the findings, in part at least, are predicated will be subsequently considered.

■ The Commission states: "Only by evidence that an individual member was unaware of what objectives were being pursued by the Institute, and that his own policy and practice were completely at variance with that objective, can there be any ground for contention that particular corporate petitioners [respondents] were not properly found to have been partners with the others." This is a novel and dangerous rule to be followed in the establishment of a conspiracy. It would place the burden upon the one charged to prove that he was not a member. The assertion is not supported by any authority, so far as we are aware, and must be rejected.

Neither do we think that mere membership in the Institute, especially in view of the fact that a large majority of the instant respondents were persuaded or induced to become members for the purpose of enabling the industry to cooperate with the Federal government in the time of emergency, creates the slightest inference that they were members of an unlawful combination or conspiracy.

Finding 7(o), strongly relied upon by the Commission in support of its thesis that the Institute was the vehicle employed by the alleged combination, states: "When the Institute was organized in August 1929, the statement of purposes contained in the articles of association included these provisions:

"To adopt and promulgate a Code of Ethics for the government of the members.

"To establish and maintain *all such lawful trade customs and usages* [italics ours] for the protection of the members as the Institute may deem advisable.

"The multiple basing-point delivered-price system was one of the 'customs and usages' to be maintained."

The Commission contends that the Institute by its express purpose to "maintain all such lawful trade customs and usages" actually embraced and made the multiple basing point price system a part of its program. We think such contention is palpably untenable. If the system was lawful at that time, as the Institute and everybody else for that matter thought by reason of the decision in the old Cement case which had been decided only a few years previously, then it was included in the language quoted. If, however, it was unlawful, there certainly can be no inference from the language quoted that it was the express purpose of the Institute to maintain it.

Finding 7(o) continues by quoting from the Code of Ethics adopted by the Institute, which was in effect only until the beginning of the N.I.R.A. Code period. One declaration from this Code labels as an unfair trade practice the diversion of carload shipments of cement from their original destination to some other for the purpose of enabling the purchaser to obtain cement at less than the market price at the point

of final delivery. Other statements from the Code have to do with provisions which should be included in a contract for the sale of cement, and a recommendation that prices be made f.o.b. a specific destination or destinations. Finding 7(p) relates in the main to activities in connection with the N.R.A., and concludes: "The multiple basing-point delivered-price system was continued in full operation during the NRA Code period."

Finding 12(c) refers to a recommendation by the Institute that no freight allowances be shown on invoices, and that receipted freight bills be accepted as part of payment of invoices. The finding goes on, however, to state that the recommendation was rejected by respondents.

Finding 8(d) has to do with rate books published by the Institute in order to provide common freight rate factors for pricing purposes. Findings 8(h), (m) and (n) refer to the dissemination by the Institute of land grant freight rates. Finding 13(a) refers to the services rendered by the Institute in connection with specific job contracts. Without a detailed discussion of these various activities of the Institute as found, it is sufficient to state that they are all within the legal sphere of a trade association, as held in the old Cement case.

It is also material to note some of the things the Institute did not do. Except for open price filing under the N.R.A. Code and for three months thereafter, there was no exchange of prices or price data among the members through the Institute or otherwise, and the Institute did not receive from members or send out to them any reports as to prices, either daily or otherwise. Even in the specific job contract reports, prices were omitted, although the old Cement case held that inclusion of prices in such transactions was lawful. The Institute did not receive or send out any information as to basing points, base prices, change of mills from non-base to base, or vice versa. Even the freight rate books were not limited to rates from basing points, although under the old Cement case they might have been so limited. The Commission does not find that any pricing practice of the industry generally or that any pricing practice or policy of any respondent was developed or changed by or through membership in the Institute or by or through any act of the Institute. Most important of all perhaps is that there is no finding that the Institute either had or exercised any power or authority or could or did impose any restriction upon the activities of its members.

Findings 5 and 6 have to do with what is now asserted to be background testimony. In the former, it is stated that the Association of American Portland Cement Manufacturers was organized in 1902 and that in 1916 its name was changed to Portland Cement Association. Between 1907 and 1911, several members of the Association of American Portland Cement Manufacturers were also members of the Association of Licensed Cement Manufacturers. The Cement Manufacturers Protective Association was organized in 1916, and remained active until shortly before the decision of the Supreme Court in 1925 in the old Cement case.

Finding 6(a) states that cement producers from 1902 to the present time have evidenced a strong aversion to free competition and that its members have "by understandings and agreements, developed and maintained substantial uniformity of action among themselves with respect to practically every marketing procedure which involves price or other competition." It goes on to point out that many of the current practices of the industry originated in agreements as long as 20 to 30 years ago. The finding then contains this remarkable statement as applicable to the instant situation: "Some of the respondents have been parties to substantially all of these activities; other respondents have participated in a lesser degree, or fully or partially for shorter periods of time; other respondents have been mere followers, adopting and supporting the practices of their more active associates; and a few respondents have from time to time, for various reasons, participated only reluctantly in some of the practices, and have occasionally opposed for a time particular instances of group action." It will thus be noted that the respondents are divided into

four classes, some who have been active, some less active, some mere followers, and some who only participated in some of the practices some of the time. No attempt is made here or elsewhere to classify the various respondents or the particular practices in which they have participated or the period of such participation.

Finding 6(a) states that the cooperative activity among cement producers commenced with the A.A.P.C.M. in 1902 and continued to the present time. Finding 7(i) refers to the period of time during which the multiple basing point price system evolved and quotes from the minutes of a meeting of the A.A.P.C.M. held in December 1904. A resolution was adopted at that meeting and statements were made by representatives of certain cement producers. Also is quoted a statement by a representative of Lehigh made at an association meeting in Philadelphia in 1905, and also statements made by certain other representatives of the industry. Further, extracts are quoted from a report made by a chairman of the committee on trade and from a letter written in 1908. Finding 7(j) relates to certain patent litigation which resulted in a decision in 1906 and which was compromised by the issuance of a license to certain named cement manufacturers. Finding 7(k) is an excerpt from minutes of an A.A.P.C.M. meeting in 1910 designed to show that certain Michigan mills had agreed to follow the prices fixed by Lehigh.

Finding 8(b) states that members of the industry commenced the preparation and publication of special freight rate books in 1914, which was continued until 1922 in much the same form as was subsequently supplied by the Institute. Finding 8(d) contains extracts from three letters written in 1916 and 1918 relating to the C.M.P.A. freight rate books. Finding 13(c) contains excerpts from reports relating to specific job contracts of A.A.P.C.M. in 1915 and of P.C.A. in 1919. Finding 14(b) contains numerous excerpts from meetings of the A.A.P.C.M. in 1905, 1906, and 1915, relating in the main to the conditions of sale and agreement to standardize the customs and usages of the cement trade and certain other trade policies, which it is asserted

demonstrate collective action. Finding 14(c) has to do with a pamphlet adopted by the P.C.A. in 1919, containing various recommendations adopted by that association. It is pertinent to note that this finding states that the P.C.A. was "largely composed of respondents herein," without designation as to which respondents are referred to. Finding 15(b) contains excerpts from minutes of A.A.P.C.M. meetings in 1903, 1904, 1910 and 1911, relating to overproduction of cement resulting in lower prices. Finding 17(b) contains excerpts from reports issued by A.A.P.C.M. in 1915 and P.C.A. in 1919, dealing with recommendations as to the definition of a dealer, which it is asserted shows concerted action which "began many years ago." Finding 20(a) refers to minutes of a meeting of the A.A.P.C.M. in 1904, recommendations of the same association in 1915, and recommendations by the P.C.A. in 1919, concerning the standardization of cement which it is asserted shows "collective action by the cement industry." Finding 20(c) contains a statement made by a cement manufacturer in 1904, designed to show that cement was to be sold according to "agreed specifications."

The Commission contends that the propriety of this background testimony is sustained by substantial judicial precedents, and cites American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93, which was a criminal conspiracy case. The court held that historical evidence of the relation of defendant corporations to the old American Tobacco Company, which had been dissolved as an unlawful combination, was admissible (147 F.2d at page 119) "for the purpose of throwing light upon the subsequent offenses, acts, and practices charged" against the defendants, and whether such evidence did throw any light upon them was "properly a question for the jury." It will be noted the defendants in that case were the same as those connected with the old company, concerning which the background testimony was held admissible. In the instant proceeding the situation is quite different. Thirty-one of the present respondents against whom this evidence was offered were not even in existence prior to 1916. Twenty-five of

the present respondents were not in existence during the life of C.M.P.A. Between 1902 and 1929, when the present conspiracy is asserted to have had its inception, there are wide gaps of time during which no proof was offered that the cement industry were members of any trade association or engaged in any cooperative activity. Thus between 1922 when the C.M.P.A. was dissolved and August 1929 when the Institute was organized, there was no association in existence. The evidence relating to the old A.A.P.C.M. extends no later than 1915. Thus there is a gap of fourteen years between that time and the organization of the Institute. The evidence relating to the old A.L.C.M. is prior to 1911. In the evidence relating to it there is a gap of eighteen years prior to the organization of the Institute.

Much of this background testimony was before the Supreme Court in the old Cement case, and we know of no reason why it all could not have been used if deemed material. The Commission, in referring to the successful contention of the cement industry in that case states: "That same contention was successfully made in Cement Mfrs. Protective Association v. U. S., but it is obvious that it would not have prevailed had the historical facts disclosed by the evidence here in question been before the Court and had it been relied on by the Government." As already stated, some of this background testimony was before the court, but whether so or not, it ill behooves the Commission at this late date to infer that government counsel at that time was so incompetent as to fail either to offer or rely upon evidence material to its case. The Commission also states: "Petitioners thus had every opportunity to meet this evidence long before they closed their defense * * *." We doubt the accuracy of such an assertion in view of the fact that some of this testimony antedated the hearing by 35 or 40 years, but in any event it is a lame excuse for the use now sought to be made of it. Again the Commission reiterates: "The conspiracy charged was against the Institute and its members. It is what they did during the existence of the Institute that constituted the conspiracy and the order

to cease and desist is directed only against those things."

The Commission accuses respondents of using this old evidence "as the beginning of a continuing conspiracy" as the basis for their argument on res adjudicata and estoppel, that is, "it is the same alleged conspiracy" which had its "origin" before 1925, the year the old Cement case was decided by the Supreme Court. There is no basis, however, for the inference or accusation that this theory of continuous conspiracy was conceived by respondents. The record discloses indisputably that it was promulgated and fostered by the Commission. The complaint charged a combination "for more than eight years last past." The complaint was filed July 2, 1937, and the Institute organized in August 1929. "More than eight years," of course, placed its inception prior to the organization of the Institute. Just how long before was not disclosed. The record shows unmistakably, however, that the case was tried by the Commission on the theory that the conspiracy had its origin some 25 or 30 years prior to the filing of the complaint and that it was in continuous operation up to that time. Moreover, the findings themselves strongly indicate that at the time they were drawn the Commission was still proceeding on such theory. It was only when the Commission's brief was filed in this court that it first planted its position upon the ground that the conspiracy here alleged originated in 1929.

From what we have said it is perfectly plain that this background testimony was not used "for the purpose of throwing light upon the subsequent offenses, acts, and practices charged," but that it was used as a part of the foundation upon which the finding of combination was predicated.

We now come to the findings based upon respondents' activities during the N.R.A. Code period from 1933 to May 27, 1935. As already shown, the Institute was a trade association that applied to the President of the United States, under the provisions of the National Industrial Recovery Act of June 16, 1933, for the approval of a Code of Fair Competition for the cement industry.

Some 57 of the corporate respondents became members of the Institute at that time for the express purpose of participating in the formation of and compliance with such Code. It is the contention of the respondents that all evidence as to activities of the Institute and its members in the preparation and submission to the N.R.A. of proposals for a Code of Fair Competition and amendments thereto for the industry, and all evidence as to the terms of the Code itself and its amendments, and as to activities in complying with its provisions and its administration by the Code authority, is incompetent, and that findings predicated upon such evidence are improper.

This contention arises from the provision of the N.I.R.A. exempting certain activities performed in compliance with the provisions of the Act from the provisions of the anti-trust laws. The findings covering this period, like those referring to the background, are numerous and strongly relied upon by the Commission in support of its asserted finding of the combination charged. We shall refer to only a few of the many findings which come within this category. Finding 7(p) recites a proposal by the Institute for the proposed Code, which was never approved, that all cement should be sold f.o.b. point of delivery except that quotations to the Federal government should be f.o.b. mill where land grant rates are involved. Finding 11(g) recites a provision of the Code, declaring it an unfair method of competition by any transportation agency which makes concessions by rebate or otherwise. Finding 12(b) recites a provision in the Code making it a violation to divert shipments of cement from one destination to another. Finding 13(f) contains a Code provision relating to the terms and conditions of sale. Finding 14(f) contains a provision concerning cash discount. Finding 17(d) relates to a provision of the Code having to do with dealers and various classes of buyers. Finding 20(a) refers to a Code provision as to standard specifications for cement.

Numerous other findings incorporate correspondence between the Institute and the Code authorities, correspondence between members of the industry relative to Code provisions and those proposed, as well as other statements made by representatives of some of the respondents relative to the same subject matter. We have read all this evidence as it appears in respondents' appendix and if it reveals anything it is the great divergence of opinion which existed between members of this industry. It was with difficulty that many of them were persuaded to agree to what was proposed and done in connection with the Code. In fact, some never did agree. They were a queer lot of conspirators.

The Commission contends that all this evidence as to their activities and Code agreements is competent to show the continuity of their objectives and methods "before, during, and after such period." The Commission, referring to respondents' contention as to this evidence, asserts: "From a logical standpoint it is a preposterous proposition and from the standpoint of judicial precedent it has no support." The Commission further argues in support of its contention that it cannot be rationally contended that respondents can be protected by a statute "unanimously held unconstitutional and therefore void ab initio."

Both respondents and the Commission rely upon the same cases in support of their respective contentions, namely Dietzgen Co. v. Federal Trade Commission, 7 Cir., 142 F.2d 321, and United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. We do not see how the Commission derives any comfort from the decision of this court in the Dietzgen case. The price fixing combination charged in that case was based upon what happened subsequent to the invalidation of the N.I.R.A. The court states (142 F.2d at page 324): "It [the Commission] also found that petitioners complied with the N.R.A. Code prices from November, 1933, to May 27, 1935, when the Supreme Court declared the pertinent part of the Act unconstitutional. In June of that year, the petitioners' representatives again met and agreed to keep the N.R.A. Code prices in effect * * *." The opinion then goes on to recite the agreements which were made concerning the price structure. The court (142 F.2d at page

329) made this pertinent observation: "* * * the N.R.A. permitted price fixing. In fact, it decreed price fixing. It is true, it was allegedly enacted to meet a temporary condition, an emergency, but even so, price stabilization was its objective and its result." The opinion proceeds to state what was done by the defendant after the death of the Code and that thereafter the defendant was not protected by its provisions. In a footnote (142 F.2d at page 329), this court made another pertinent observation: "We are convinced that notwithstanding this fact [the unconstitutionality of the Act], the Government was estopped to prosecute citizens who complied with N.R.A. codes * * * because the N.R.A. was presumably valid until by judicial pronouncement it was declared to be invalid * * *."

In the Socony case, the defendants were charged with having engaged in two concerted buying programs, from February 1935 to December 1936. The defense interposed in that case was not that the buying programs gained immunity under the N.I.R.A. but rather that the programs were undertaken and carried out with the knowledge and acquiescence of officers of the government charged with responsibility in the administration of the Code, and that proof of those facts should be taken into consideration in order to judge the purpose, effect and reasonableness of their activities in connection with the buying program. That defense was rejected. In short, since the buying programs were admittedly not authorized under the Code, proof of knowledge and acquiescence by the government gave no immunity under the N.I.R.A. The court stated (310 U.S. at page 228, 60 S.Ct. at page 847, 84 L.Ed. 1129): "The offers of proof covering the background and operation of the National Industrial Recovery Act and the Petroleum Code * * * were properly excluded, insofar as they bore on the nature of the restraint and the purpose or end sought to be attained." If the defendants were not entitled to rely upon their activities during the Code period as an explanation for what they did subsequently, we think the Commission in the instant case is not entitled to rely upon what happened during the Code period to show a conspiracy either during that period or any other time.

Assuming this evidence might be proper for the purpose of "illumination" on the same theory that the Commission seeks to justify the admission of background testimony, it certainly is not admissible for the purpose of showing a conspiracy prior or subsequent to the N.I.R.A. period or a continuity of such conspiracy during such period. To hold that members of an industry can be invited and perhaps required by the government to participate in a program for the general welfare under a promise of immunity and that evidence of their doings and activities in connection therewith can be used to hold them for a conspiracy would constitute a fraud, or perhaps confidence game would be a more appropriate designation.

There is a great volume of other evidence which respondents assert was improperly considered by the Commission. We shall not go into it any further except as to one incident and we only mention this for the reason that the Commission has, in our judgment, exaggerated its importance beyond all reason. A part of finding 7 (r) and a part of finding 21 (f) are predicated upon a letter dated May 17, 1934, written by John Treanor, president of respondent Riverside, to B. H. Rader, chairman of the Code Authority for the cement industry. We need not detail that portion of the letter contained in 7 (r). It appears that Rader as chairman of the Code Authority had been in negotiation with Barton W. Murray, Deputy Administrator of the National Recovery Administration, concerning the request of the latter for a provision in the Code permitting cement to be sold to the Federal government on an f. o. b. mill price. Treanor expressed the view in this letter that the request should be granted. In finding 21(f) a portion of this same letter, apparently directed at some of the advertising indulged in by the Institute in defense of the basing point system, is quoted as follows: " 'Do you think any of the arguments for the basing-point system, which we have thus far advanced, will arouse anything but derision in and out of the government? I have read them all recently. Some of them are very clever and ingenious.

They amount to this however: that we price this way in order to discourage monopolistic practices and to preserve free competition, etc. This is *sheer bunk and hypocrisy* [italics ours]. The truth is of course—and there can be no serious, respectable discussion of our case unless this is acknowledged—that ours is an industry above all others that cannot stand free competition, that must systematically restrain competition or be ruined * * *.'"

Rader in his capacity as chairman of the Code Authority replied to this letter on May 21, 1934, in which he said among other things: "The Code Authority members feel that they sent the proper kind of a telegram. It is not arbitrary, but it is not giving everything they ask for without a chance to explain it." Treanor sent copies of his letter to eight other individuals who were associated with him on a recently appointed group to study the industry's public relations and to the president of the P.C.A. who also was participating in that work. It was not sent by Treanor or Rader to the other twenty-two members of the board of trustees of the Institute. The Commission states: "The relation of the Institute to the basing point system and of the system to price competition was never more clearly and frankly stated than by John Treanor, one of the trustees of the Institute and at the time president of petitioner Riverside." The Commission quotes in its brief the phrase from Treanor's letter, "sheer bunk and hypocrisy," on at least twelve different occasions. It commences and concludes its brief on that thesis.

Treanor had died prior to the hearing. At the time his letter was offered, counsel for the Commission in arguing for its admissibility stated: "It is a part of the acts of the industry, of the Code Authority of the industry, of the Cement Institute, of which this man was a high official; and to argue that it is merely his personal expression—of course, everybody's expression is personal, but it frequently goes beyond a personal responsibility and makes his associates responsible, if he is engaged with them in a common activity." We think the letter was incompetent. In the first place, it was written to an official of the Code Authority during the N.R.A. period concerning a provision of the Code under consideration. In the next place, it contained no statement of fact but was clearly the expression of the opinion of the writer upon a question that was more legal than factual. It could hardly be classified as an act or statement in the execution or perpetuation of a conspiracy even though it be conceded one was in existence.

In Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, the court held that in an administrative proceeding a written statement made by a person not a party to the proceeding was inadmissible, and on page 153 of 326 U.S. on page 1452 of 65 S.Ct., 89 L.Ed. 2103, stated: "We may assume they would be admissible for purposes of impeachment. But they certainly would not be admissible in any criminal case as substantive evidence. [Citing cases.] So to hold would allow men to be convicted on unsworn testimony of witnesses—a practice which runs counter to the notions of fairness on which our legal system is founded." Another pertinent observation is found in United States v. International Harvester Company, 274 U.S. 693, 703, 47 S.Ct. 748, 752, 71 L.Ed. 1302, where the court stated: "But it is entirely plain that to treat the statements in this report—based upon an ex parte investigation and formulated in the manner hereinabove set forth—as constituting in themselves substantive evidence upon the questions of fact here involved, violates the fundamental rules of evidence entitling the parties to a trial of issues of fact, not upon hearsay, but upon the testimony of persons having first-hand knowledge of the facts, who are produced as witnesses and are subject to the test of cross-examination." If Treanor had been living and called as a witness by the Commission, we think he would not have been permitted to express the opinion contained in this letter. We know no reason why its competency would be enhanced by the fact that it was recorded in writing long prior to the hearing and his death.

We have labeled finding 7 as the heart of the Commission's case, which we afterward consider in detail. At this point

we refer to it only in connection with its bearing upon the combination alleged. It contains a hypothetical illustration of the operation of the pricing system involved. Finding 7(h) in part states: "It is equally plain that this formula, once put into operation, is self-perpetuating in the sense that renewed understandings or agreements are not needed to maintain identical delivered prices over an indefinite period of time." So we are informed by this finding that the multiple basing point price system is "self-perpetuating" and that "renewed understandings or agreements are not needed." Certainly this is no finding of the combination or agreement here asserted. If it has any significance it is that when the Institute was organized in 1929 it was unnecessary to have an agreement or understanding because the system which had been in use by the industry long prior to that time was self-perpetuating. This finding, rather than furnishing support for the alleged combination, is in reality a recognition of respondents' contention that the pricing system was one of the trade practices long followed in the industry and that it was continued after 1929 without combination, conspiracy or agreement.

Finding 7(h) continues: "This formula was not evolved and put into operation at one stroke. It came into existence and its territorial application was extended from time to time as a result of understandings and agreements among cement manufacturers." By whom such "understandings and agreements" were had is not disclosed, but it is evident that the finding refers to cement manufacturers long prior to 1929 for the reason that there follows, in finding 7(h), (i), (j), (k) and (1) a recitation of documentary and other evidence designed to show how the system was originated and practiced from 1901 to 1915. Finding 7(m) states: "In southern California the basing-point system of pricing is modified by an elaborate system of zone prices applicable in certain areas. * * * The limited number of points at which sales are made makes it possible for each respondent to publish, and each has published, complete price lists showing the delivered prices at substantially all delivery points." Again we are left in the dark as to which of the respondents used this so-called elaborate system of zone prices, but it is evident from this finding that such respondents did not use the system alleged in the complaint. Again, 7(n) states: "The multiple basing-point delivered-price system was extended to western Washington in 1931. Its introduction there followed a price war which commenced when two new mills began operating in that territory, one in 1928 and the other in 1929, and was approximately coincident with the leasing of one of these new mills by Superior Portland." It is to be noted that the finding does not disclose by whom the system was extended to Washington or for what purpose, or by which, if any, of the respondents it was used. Certainly there is not even an inference that the system was used either in California or in Washington in connection with any combination or conspiracy.

The entire findings are permeated with uncertain and indefinite terms, such as 8(b) "some of the present respondents," 8(g) "by most of the corporate respondents," 8 (i) "respondents interested in particular bids," 8(i) "groups of respondents concerned in the same bid," 8(o) "certain respondents on the Pacific Coast," 12(c) "with a few exceptions respondents did not continue to require," 13(d) "a number of the corporate respondents," 13(g) "one of the corporate respondents," 15(b) "a number of the respondents herein," 15(c) "some 50 of the corporate respondents herein," 15(f) "among many respondents," 15(g) "Some respondents," 15(i) "A few members of the Institute," 17(e) "by various of the corporate respondents," 19(a) "corporate respondents who sell cement in some of the larger seaport cities," and 19(b) "participating respondents."

Up to this point there is no finding of the combination charged. The Commission, however, places its chief reliance in this respect upon findings 22 and 26. Finding 22 is based upon the opinion testimony of numerous economists who testified in the proceedings concerning the application of the principles and theories of economics in hypothetical situations. The Commis-

sion stresses the following statement from finding 22(c): "When—as in the sale of cement—the price is established by the seller, the price leadership of the governing base mill is accepted by other sellers and there is no bargaining between buyers and sellers, fundamental requirements of a true market in the economic sense are lacking, and prices are not the result of market action in a true economic sense but merely expressions of a noncompetitive or monopolistic price structure."

We afterward discuss this finding in connection with the uniformity of delivery prices. At this point, it is sufficient to observe that in our judgment it neither proves nor tends to prove the combination alleged. Perhaps it could be treated as an indictment of the basing point system, but even so the finding does not show that such use was by conspiracy in contrast to individual action. Furthermore, we are of the view that in the absence of actual fact proof, direct or circumstantial, the combination charged cannot be shown by opinion evidence. The Minnesota Rate Cases (Simpon v. Shepard), 230 U.S. 352, 465, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A., N.S., 1151, Ann.Cas.1916A, 18; The Missouri Rate Cases (Knox v. Chicago, B. & Q. R. Co.), 230 U.S. 474, 507, 33 S.Ct. 975, 57 L.Ed. 1571; and Baltimore and Ohio R. Co. v. United States, 298 U.S. 349, 378, 56 S.Ct. 797, 80 L.Ed. 1209.

Finding 26 is the last of the long and complicated findings made by the Commission. It states: "The Commission concludes from the evidence of record and therefore finds that the capacity, tendency, and effect of the combination maintained by the respondents herein in the manner aforesaid and the acts and practices performed thereunder and in connection therewith by said respondents, as set out herein, has been and is to hinder, lessen, restrain, and suppress competition in the sale and distribution of cement * * *; to deprive purchasers of cement, both private and governmental, of the benefits of competition in price; to systematically maintain artificial and monopolistic methods and prices in the sale and distribution of cement * * * and otherwise to promote and

maintain their multiple basing-point delivered-price system and obstruct and defeat any form of competition which threatens or tends to threaten the continued use and maintenance of said system and the uniformity of prices created and maintained by its use."

It is argued by respondents that this is no finding of combination, that it only has reference to the "effect of the combination maintained by the respondents." We think there is merit to this criticism. It is difficult to comprehend why the Commission failed or neglected to make a forthright finding as to the combination charged, together with findings which would disclose in no uncertain terms how and in what manner each of the respondents became a member thereof. Assuming, however, that it is a finding of combination, a reading discloses that it is predicated upon "the acts and practices performed thereunder and in connection therewith by said respondents, as set out herein." This means, so we think, that the finding of combination, if such it be, is predicated upon all previous findings, many of which, as heretofore shown, are applicable to only some of the respondents without naming them. It also must be predicated in part upon findings based on background testimony, upon findings based on testimony relative to the N.I.R.A. period, and upon other testimony which we hold to be incompetent. We have no way of knowing, of course, the extent to which the incompetent testimony and findings entered into the ultimate finding, but it is evident that they played no small part.

The Commission apparently recognizes the weakness of its finding of a combination and states: "Besides the general finding of combination above quoted from Paragraphs Twenty-two and Twenty-six of the findings and applicable to all petitioners [respondents], there are similar findings in the following paragraphs applicable *to some or all petitioners* [respondents] [italics ours] in their collective capacity * * *." Then follow extracts from some thirty findings, covering more than three pages of the Commission's brief which, as the Commission states, are applicable "to some or

all petitioners [respondents]." Such findings, however, cannot in our opinion form the basis for the combination found in finding 26. In many of such findings it is plainly disclosed that some of the petitioners were pursuing one course and others a directly opposite course. In fact, the Commission does not seriously contend that the innumerable findings applicable "to some or all petitioners [respondents]" form any basis for the general finding of combination but revert to their original position that membership in the Institute alone is sufficient. It states: "We submit that such membership would, though it stood alone, make them all responsible for the acts and policies of the Institute · as their joint agent." The argument continues: "After voluntary affiliation with the combination through membership in the Institute, and after having been apprised of its purpose to maintain the basing point system as above outlined, each has participated in the combination through its own use of a pricing system consonant with that for which the Institute was formed and which it has undertaken to preserve." If the Commission thought that membership in the Institute alone, in connection with the use of the basing point system, was sufficient upon which a finding of combination could be predicated, the question naturally arises as to why such a finding was not made. We doubt if such a finding could be sustained, but whether so or not is now immaterial.

The Commission further argues: "We submit that after the Commission had decided that all the petitioners [respondents] were parties to and participants in the combination it was proper to treat the declarations and acts of the respective petitioners [respondents] as the declarations and acts of all and to ignore in its conclusions the nice distinctions between the exact nature and degree of their respective participations." This perhaps would be a sound argument if it were predicated upon what happened. Of course, we have no way of knowing at what point the Commission decided that all the respondents were parties to the combination except as disclosed by its findings. As already shown, it made

voluminous findings as to what might be termed overt acts in the law of conspiracy and then predicated its finding of combination or conspiracy upon such overt acts. It placed the cart before the horse.

If this were an ordinary proceeding we would return it to the Commission for the purpose of revising its findings if it could and so desired in the light of what we have said. However, we are confronted with what might be termed an extraordinary situation. As already observed, it will soon be ten years since this proceeding was initiated. After all, the status of the basing point price system is not to be determined merely from the factual situation. It involves a question of law which ultimately, and the sooner the better, must be decided by the Supreme Court. We think the case should be on its way up and not down. For this reason we shall not return it to the Commission but shall proceed to decide the legal issues involved.

### The Heart of the Commission's Case.

The heart of the Commission's case, upon which it must stand or fall, is embodied in finding 7, which we shall consider in some detail. As a preface to such consideration, it is material to have in mind certain important facts not in dispute:

1. The overwhelming testimony is that the buyers of cement will not pay more for one brand of cement than for another. It is an interchangeable product. The complaint so recognizes, and finding 9(a) states: " * * * a difference in price as small as one cent per barrel may divert business from one seller to another."

2. There is no exchange of price information between the respondents either through the Institute or otherwise. Finding 9(e) states: "Except to the extent that the dissemination of delivered prices during the NRA Code period and some seven months thereafter necessarily carried with it an exchange of base prices, and except for limited direct exchanges among certain respondents which the record does not show to have been made under the auspices of the Institute, there has been no system-

atic exchange among the corporate respondents of basing-point prices or changes in such prices."

3. Likewise, there is no proof or finding of any exchange of information or any agreement among respondents concerning the price f.o.b. mill.

4. Information concerning prices is obtained by respondents from their respective customers and salesmen. Finding 9(e) states: "When a corporate respondent makes a change in its base price, written delivered-price quotations reflecting · this change are usually sent to all customers. Through common customers and through salesmen in the field, information concerning this change reaches the other respondents selling cement in that area almost immediately."

5. There is no agreement either through the Institute or otherwise as to whether a respondent shall operate a base or non-base mill. Finding 7(b) states: "The number and identity of base and non-base mills change from time to time. A base mill may, for reasons its management considers sufficient, become a non-base mill, and, similarly, a non-base mill may become a base mill."

6. Dealers in cement and purchasers thereof, including governmental agencies, are almost unanimous in their desire to purchase on a basis of cost at the point of destination.

7. There is no finding of an agreement among respondents of a refusal to sell at an f.o.b. plant price.

It is also interesting and perhaps pertinent to note certain euphonical words employed by the Commission. It invariably employs the word "match" for "meet." The importance which the Commission attaches to this "matching of prices" rather than the "meeting of prices" is illustrated by the fact that in its brief it uses the former phrase not fewer than thirty-seven times. The purpose of this is obvious in the light of the language of the Supreme Court in the old Cement case and that contained in Sec. 2(b) of the Clayton Act as amended. Another favorite word is "shrink." It seldom speaks of "absorbing"

freight in order to meet an equally low price of a competitor but invariably talks about "shrinking" the mill nets. It always speaks of a "system" or "formula" and never a "method" of pricing, and the prices at the point of destination are always described as "identical" rather than "uniform."

Finding 7(a) states: "Substantially all sales of cement by the corporate respondents are made on the basis of a delivered price; that is, at a price determined by the location at which actual delivery of the cement is made to the purchaser." It is pertinent to note in connection with this statement that sales are thus made because the market for cement is invariably at the buyer's destination; that is, the dealers whom the Commission characterizes as the "backbone" of the business insist on knowing how much it will cost delivered. This is also true generally of all purchasers of cement, including governmental agencies. That it is sold on this basis as a result of the demand of the buyer was conceded by counsel for the Commission on oral argument.

Finding 7(a) continues: "In determining the delivered price which will be charged for cement at any given location, respondents use a multiple basing-point system." Like many of the findings, the term "respondents" is indefinite and uncertain. Evidently it does not include all the corporate respondents. In fact, most of the Pacific Coast respondents deny that they have ever used this system of pricing. As already shown, the Commission concedes that the system used by some of these Pacific Coast respondents "is modified by an elaborate system of zone prices applicable in certain areas."

Finding 7(a) continues: "The formula used to make this system operative is that the delivered price at any location shall be the lowest combination of base price plus all-rail freight. Thus, if Mill A has a base price of $1.50 per barrel, its delivered price at each location where it sells cement will be $1.50 per barrel plus the all-rail freight from its mill to the point of delivery, except that when a sale is made for delivery

at a location at which the combination of the base price plus all-rail freight from another mill is a lower figure, Mill A uses this lower combination so that its delivered price at such location will be the same as the delivered price of the other mill. At all locations where the base price of Mill A plus freight is the lowest combination, Mill A recovers $1.50 net at the mill, and at locations where the combination of base price plus freight of another mill is lower, Mill A shrinks its mill net sufficiently to equal that price. Under these conditions it is obvious that the highest mill net which can be recovered by Mill A is $1.50 per barrel, and on sales where it has been necessary to shrink its mill net in order to match the delivered price of another mill, its net recovery at the mill is less than $1.50."

This is a highly significant statement. The complaint contains no definition of the formula or system under condemnation, and the finding just quoted contains the only authoritative definition found in the record. It will be noted that the formula thus stated ignores non-base mills with their resultant phantom freight and is confined solely to base mills. In other words, according to the formula stated, it is complete and operative without the collection of any phantom or fictitious freight.

Finding 7(b) states: "Approximately half of the mills operated by the corporate respondents have base prices and are known as base mills. The other mills which have no base prices are known as non-base mills." Neither in this finding nor in any other is it revealed which mills are base and which are non-base. Furthermore, it is asserted in a respondent's brief

and not denied by the Commission that "At the close of the taking of testimony in this case on November 29, 1940 there were 138 cement mills and 15 packing plants operating in the area east of the Pacific Coast. Of these, 96 were base mills, 15 were base packing plants and 16 were mills located within 50 miles of one or more of the base mills. This total of 112 mills and 15 packing plants, scattered in thirty six states, represents 86% of the total productive capacity in this area." Counsel for the Commission conceded in oral argument that all of the Pacific Coast mills were base mills.

Finding 7(c) states: "Having no base price, a non-base mill quotes and sells cement at delivered prices determined by the lowest combination of base price plus freight from base mills. The mill net of a non-base mill is therefore highest in its home location and is less at all other locations by the amount of the freight from its mill to the point of delivery to the purchaser." While this finding has to do with non-base mills and the resultant fictitious or phantom freight, it is not included as a part of the definition of the formula or system under attack.

Finding 7(g) states: "The following is a hypothetical illustration of the system of pricing described: Assume that the base price of Mill A, located at Town A, is $1.50 per barrel; that the base price of Mill C, located at Town G, is the same; that Mill B, located at Town D, is a non-base mill; and that the all-rail freight rates are as indicated. Then the delivered prices of cement in the several towns and the mill nets of the several mills would be as shown below:

| | Town A | Town B | Town C | Town D | Town E | Town F | Town G |
|---|---|---|---|---|---|---|---|
| Freight from Mill A......... | 0 | $0.10 | $0.20 | $0.30 | $0.40 | $0.50 | $0.60 |
| Freight from Mill B......... | $0.30 | $0.20 | $0.10 | 0 | $0.10 | $0.20 | $0.30 |
| Freight from Mill C......... | $0.60 | $0.50 | $0.40 | $0.30 | $0.20 | $0.10 | 0 |
| Delivered price of Mill A..... | $1.50 | $1.60 | $1.70 | $1.80 | $1.70 | $1.60 | $1.50 |
| Delivered price of Mill B..... | $1.50 | $1.60 | $1.70 | $1.80 | $1.70 | $1.60 | $1.50 |
| Delivered price of Mill C..... | $1.50 | $1.60 | $1.70 | $1.80 | $1.70 | $1.60 | $1.50 |
| Mill net of Mill A............ | $1.50 | $1.50 | $1.50 | $1.50 | $1.30 | $1.10 | $0.90 |
| Mill net of Mill B............ | $1.20 | $1.40 | $1.60 | $1.80 | $1.60 | $1.40 | $1.20 |
| Mill net of Mill C............ | $0.90 | $1.10 | $1.30 | $1.50 | $1.50 | $1.50 | $1.50" |

As shown, the Commission in its definition of the pricing formula did not include a non-base mill with its resultant phantom and fictitious freight, but in its hypothetical illustration it includes Mill B, a non-base mill. This leaves us in doubt as to whether the system charged and found to exist is complete by the use of base mills as described in the Commission's formula with the resultant absorption of freight when selling in the territory where a competitor has an advantage freightwise, or whether the system necessarily embodies the employment of non-base mills, with the collection of phantom or fictitious freight in territory contiguous to such mills.

Finding 7(h) states: "Excluding errors made in the application of this pricing formula, it is plain that it will inevitably result in identical delivered prices for cement at any given location by all sellers using it. *It is equally plain that this formula, once put into operation, is self-perpetuating in the sense that renewed understandings or agreements are not needed to maintain identical delivered prices over an indefinite period of time.* [Italics ours.] This formula was not evolved and put into operation at one stroke. It came into existence and its territorial application was extended from time to time as a result of understandings and agreements among cement manufacturers."

While this finding states that the formula was "a result of understandings and agreements among cement manufacturers," it does not state that there were any such understandings and agreements which support the conspiracy charged in the instant case, which had its inception in 1929. In fact, as the record clearly discloses and as the Commission concedes, any understandings or agreements had long been in existence prior to the instant conspiracy and as the finding states, "renewed understandings or agreements are not needed." The formula, once put in operation, is "self-perpetuating."

The hypothetical illustration in connection with the awesome table shown in 7(g) becomes simple when properly understood. For the purpose of reducing it to a simple and easily understood form we insert at this point a crude illustration of our own which illuminates the Commission's illustration:

Mill A—Base pr. $1.50

Town A
Frt. from A to B 10¢
Del. pr. at B $1.60

Town B
Frt. from A to C 20¢
Del. pr. at C $1.70

Town C
Frt. from A to D 30¢
Del. pr. at D $1.80

Mill B—Non-base

Town D
Frt. from G to D 30¢
Del. pr. at D $1.80

Town E
Frt. from G to E 20¢
Del. pr. at E $1.70

Town F
Frt. from G to F 10¢
Del. pr. at F $1.60

Mill C—Base pr. $1.50
Town G

We shall first consider the position of Mill A located at Town A and Mill C located at Town G, both of which are base mills with a base price of $1.50. According to the findings, there is no agreement between Mills A and C as to their base price. Each is free to fix such price as it may see fit. Towns B, C, D, E and F are located between Towns A and G and we assume are equidistant apart. The freight from Town A to Town B is 10¢, to Town C 20¢, to Town D 30¢, to Town E 40¢, to Town F 50¢, and to Town G 60¢. Conversely, the freight rate from Town G to Town F is 10¢, to Town E 20¢, to Town D 30¢, to Town C 40¢, to Town B 50¢, and to Town A 60¢. Town D is midway between Towns A and G, so A has an advantage freightwise from its mill to all towns between Town A and Town D, and C likewise has a freight advantage from its mill to all towns between Town G and Town D. Both Mill A and Mill C desire to sell cement on a delivered price basis; in fact, they are virtually compelled to do this because of the demands of their customers. Mill A when selling at Towns

B, C and D adds the actual freight to obtain the delivered price, and Mill C does the same when selling at Towns F, E and D. Both Mill A and Mill C are on an equal footing freightwise when they sell at Town D because D is midway between the two mills. Each of them is compelled to sell at the same price at Town D or at any other town, inasmuch as a difference of 1¢ would divert the business from one to the other. In this connection, it is pertinent to keep in mind that no price information has been exchanged between Mill A and Mill C (finding 9(e)). Furthermore, it is not claimed that the Institute has received from or transmitted to either Mill A or Mill C any price information. The information which each has as to the price the other is quoting at Town D or any other town is obtained from their salesmen in the field and "almost immediately" relayed to the two mills respectively. (Finding 9(e)).

We suppose the Commission would not complain of their selling activities up to this point. However, Mill A is at a freight disadvantage at Towns E, F and G, just as Mill C is at a freight disadvantage at Towns C, B and A. When Mill A undertakes to sell at Towns E, F and G, it finds that Mill C has a freight advantage at these towns of 10¢, 20¢ and 30¢ respectively. Conversely, when Mill C undertakes to sell at Towns A, B and C, it finds that Mill A has a similar advantage. Thus these two competing mills are faced with a simple business proposition which can be solved in one of two ways, as their individual judgment may dictate. Each can confine its sales to the territory in which it has an advantage or can extend its business into the territory of the other. If they follow the former course, as the Commission would require them to do by its order, each will have a monopoly in its own territory and competition will be at an end. On the other hand, if the other course is pursued and they go into the territory where they are at a disadvantage freightwise, they necessarily must meet the price which they find there in order to sell. To enable them to do this, they absorb an amount of freight necessary to enable them to meet the price which they find. The same necessity which impels them to do this requires a reduction in their mill net in an amount equivalent to the freight which has been absorbed.

 Under the decision of the Supreme Court in the old Cement case (see also Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093), this pricing method employed by Mills A and C is not in restraint of competition, even though it results in uniformity of price at each destination. Neither, according to this decision, is the fact that they use this pricing method concurrently any evidence that they are engaged in a conspiracy. Notwithstanding this plain decision of the Supreme Court, the Commission now holds that the activities of Mills A and C constitute a restraint on competition and are unlawful. Furthermore, the Commission contends that their concurrent use of this pricing method is in and of itself evidence that they are engaged in a conspiracy. The Commission by its order proposes to free commerce from this restraint by erecting a barrier midway between Mills A and C and requiring that they each sell only in their own freight advantage territory. We shall hereafter discuss the uniformity of prices resulting from such a method of pricing, but at this point it is sufficient to observe that in our judgment the fact that Mills A and C sell at the same delivered price at all destinations is due to the fact that buyers of cement will not pay more for the cement produced by Mill A than that produced by Mill C, or vice versa.

It would be interesting to know what the Commission's position would be if Mill A and Mill C had determined to sell only in the territory where each had an advantage freightwise. According to the Commission's theory, this uniformity of action would create an inference that they were acting in concert or by agreement. This inference having been made, we assume the Commission would have no difficulty in finding that A and C were in a combination to restrain competition. The fact is that the restraint which the Commission professes to discern, effected by freight absorption, is insignificant as compared with that which would result if each sold

only in its own backyard, as the Commission would have them do.

■ Now we bring Mill B, a non-base mill located at Town D, into the picture. However, this is not a part of the system according to the Commission's formula definition, as heretofore shown. Being located midway between Town A where Mill A is located and Town G where Mill C is located, it employs as a base either that of Mill A or Mill C. Evidently it collects phantom or fictitious freight on its sales at Town D and all other towns located nearer to Town D than to Towns A and G. Undoubtedly this constitutes a discrimination against its customers in those towns and is a violation of Sec. 2(a) of the Clayton Act, as interpreted by the Supreme Court in Corn Products Company v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320, and Federal Trade Commission v. Staley, 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338, and the Commission could proceed against Mill B and all others engaging in a similar practice.

■ The most illogical argument of all is that of the Commission that the concurrent use of this pricing method is proof of the conspiracy charged, this notwithstanding the fact that this method has long been in operation in the industry and that it was not initiated by the present respondents. As heretofore shown, the Commission found that the system "is self-perpetuating" and that "renewed understandings or agreements are not needed." It seems obvious there was no reason why respondents should enter any agreement or understanding either at the time of the commencement of the conspiracy alleged or at any subsequent time.

Continuing with this hypothetical situation, how can there be the slightest inference that Mills A and C had an agreement to use the method depicted? How could Mill A, if it desired to do so, prevent Mill C from coming over and selling in the territory in which the former had a freight-wise advantage? And conversely, how could Mill C prevent Mill A from doing likewise in the territory where C had a similar advantage? Moreover, how could either Mill A or Mill C prevent the other from absorbing freight in order to meet the price of the other? And how could either prevent the other from reducing its mill net in so doing?

Neither does the fact that Mill B in the exercise of its own judgment saw fit to establish a non-base mill at Town D create the slightest inference of an agreement or concerted action. It must be remembered that according to the Commission's finding it was discretionary with Mills A, B and C as to whether they should be base or non-base mills. As the finding states, each may do so "for reasons its management considers sufficient." (Finding 7(b).) What could possibly be the motive for an agreement between these three mills that Mill B should sell cement on the base established by Mills A and C? Again we ask, how could Mills A and C if they so desired prevent Mill B from establishing itself as a non-base mill, and how could they prevent it, if they so desired, from selling on any base which its management determined? To argue that the selling system used by these three mills is evidence of a conspiracy may find support in the imagination of the fertile mind of some economic expert, but based upon common sense and the realities of the situation it is wholly without merit. If anything, finding 7, which we have labeled the heart of the Commission's case, in connection with the hypothetical illustration dispels any inference of conspiracy.

We now use another illustration taken from a respondent's brief, based upon a situation actually disclosed in the record. Scores of other like situations could be enumerated. In fact, it is typical of base mills. In Indiana, respondent Lone Star has a base mill located at Limedale, forty-one miles southwest of Indianapolis, and respondent Lehigh has a mill located at Mitchell, ninety-eight miles south of Indianapolis, also a base mill. The largest market for cement in that territory is Indianapolis. Both mills set for themselves, as they have a right to do, a figure of $1.60 per barrel, which they seek to net at their mills. As already noted, there is no charge or finding of any agreement with reference to mill prices. The freight rate from Limedale to Indianapolis is 29¢, and from

Mitchell it is 36¢, so Limedale has a 7¢ advantage. Limedale adds its actual freight to Indianapolis as well as to other points. Thus its delivered price at Indianapolis is $1.89. There is no "varying mill net," no "freight absorption," no "phantom freight" and no "cross-hauling," insofar as Limedale is concerned. The Mitchell mill, however, a competitor of Limedale, is also desirous of participating in the big Indianapolis market. In attempting to realize that desire, it quickly learns three things—(1) that Limedale is quoting a price in Indianapolis of $1.89, (2) that its own salesmen cannot sell cement for even a penny more than that, and (3) that the freight rate from Mitchell to Indianapolis is 36¢ (7¢ more than the rate of its Limedale competitor).

Mitchell, confronted with this problem, can do one of two things—stay out of the Indianapolis market or go into the market and meet the delivered price of Limedale, which is $1.89. Of course, Mitchell might quote a penny or more less than Limedale but as soon as Limedale learned of this from its salesmen in Indianapolis, which might be the next day but more likely the next hour, it would be compelled to lower its price so as to meet that of Mitchell. The delivered price of these two mills at Indianapolis would still be the same as it was before, except on a lower level. Mitchell, upon learning of Limedale's delivered price in Indianapolis, might ignore the so-called basing point system by merely meeting Limedale's price. Exactly the same result, however, would follow because by any pricing method employed Mitchell would still be confronted by the hard fact that its freight rate to Indianapolis is 7¢ more than that of Limedale. So by whatever method Mitchell uses to meet Limedale's price in Indianapolis it would have as its mill net $1.53. Of course, Mitchell absorbs 7¢ per barrel, but why does it do it? The Commission says to restrain competition, when the plain fact is that it couldn't sell in the Indianapolis market without doing so. If Mitchell was the only plant located near Indianapolis, it could and no doubt would include in its delivered price the actual freight. According to the Commission's contention, Mitchell should stay out of the Indianapolis market; in fact, under the Commission's order it would be required to do so.

The Commission makes much of the fact that Mitchell realizes a mill net of $1.60 in its home territory but is willing to accept a mill net of $1.53 on its Indianapolis sales. This, however, is the inevitable result of the desire of Mitchell to sell in the Indianapolis market. If it is to be enjoined from absorbing freight in order to reach this market, it is reasonable to think that its unit cost of production at its factory in Mitchell would be considerably increased and the price of cement to its home customers increased accordingly. In fact, Mitchell without the Indianapolis market might not be able to operate. Thus the Commission's solicitude for Mitchell's home customers would in all probability result to their detriment.

Limedale and Mitchell, like all other base mills which ship by rail, do not collect any phantom freight. Limedale, like Mitchell and like all others who sell on their own base and ship by rail, absorbs freight when going into a freight disadvantage territory in order to meet the price which it there finds. As we asked in the hypothetical situation, we again ask, how can this situation as it relates to Limedale and Mitchell, and others who occupy a like situation, be any evidence of conspiracy? How can either Limedale or Mitchell, if either so desires, prevent the other from pricing as it does? And suppose they could—would that be an aid to or a restraint on competition? We think the question answers itself.

That the heart of the Commission's case is contained in finding 7 as to the charge in count 2 as well as count 1 of the complaint is further exemplified by finding 23 (a) which states: "The multiple basing-point delivered-price system used by the corporate respondents in the sale of cement is a discriminatory method of pricing. * * * The hypothetical illustration set out in subsection (g) of Paragraph Seven indicates the types of discriminatory price differences which are systematically exacted in order that each respondent may match the delivered price of other respondents at any given point." The finding repeats the

hypothetical illustration, heretofore shown, as to the situation existing between base Mills A and C and non-base Mill B. The finding continues: "Each mill shrinks its mill net by the amount necessary for it to match the delivered prices established pursuant to the aforesaid pricing system." This is high sounding language, perhaps consistent with economic thinking, but in reality it means nothing more or less than that each mill reduces its mill net by the amount necessary to enable it to meet the delivered price of a competitor in territory where it is at a disadvantage freightwise. To state the situation realistically is of no benefit to the Commission's cause; in fact, the situation so stated brings the Commission in conflict not only with what was said and held in the old Cement case but with Sec. 2(b) of the Clayton Act which provides, "that nothing herein contained shall prevent a seller rebutting the prima facie case thus made by showing that his lower price * * * was made in good faith to meet an equally low price of a competitor * * *."

Of course, this presents the question as to whether freight has been absorbed "in good faith." In the Commission's hypothetical illustration we cannot see the slightest reason for imputing to either base Mill A or C any other than good faith in absorbing such freight as was necessary in order to meet the price of the other. It was imperative that each of these mills do so if they were to sell in the territory where the other had a freight advantage and, as already pointed out, neither of them could have prevented the other from so doing. The Commission, however, by its order would enjoin Mills A and C from so doing which would, in our judgment, eliminate or at any rate nullify the proviso contained in Sec. 2(b) of the Clayton Act. The Commission evidently recognizes its precarious situation in this respect, which accounts no doubt for the fact that it continuously uses the word "match" rather than "meet."

The Commission in its brief, without making any distinction between base and non-base mills and therefore no distinction between freight absorption and phantom or fictitious freight, makes the bold statement that the illegality of variation in mill net prices has been laid to rest by the decisions of the Supreme Court in the Corn Products and Staley cases. We do not so understand. We do understand from those decisions that when a product is sold from a base other than the point of actual shipment and phantom freight thereby collected, a discrimination in violation of the Clayton Act results. Certainly the court in those decisions did not hold that freight absorption was discriminatory; in fact, that question was expressly left open. In the Corn Products case, the court stated (324 U.S. at page 735, 65 S.Ct. at page 966, 89 L.Ed. 1320): "We have no occasion to decide whether a basing point system such as that in the Cement case is permissible under the Clayton Act, in view of the provisions of § 2(b), permitting reductions in price in order to meet a competitor's equally low price."

The decision in the Corn Products case, in sustaining the Commission's theory of discrimination, was predicated upon the fact that the company charged and collected freight from Chicago irrespective of whether its product was shipped from there or from its other plant located at Kansas City. We have every reason to think that if freight had been charged only from the point of shipment the decision would have been different. This is borne out by a statement in the Staley case, which was decided on the same date as the Corn Products case, wherein the court stated (324 U.S. at page 750, 65 S.Ct. at page 973, 89 L.Ed. 1338): "As we hold in the Corn Products Refining Company case with respect to a like system, price discriminations are necessarily involved where the price basing point is distant from the point of production. This is because, as in respondents' case, the delivered prices upon shipments from Decatur usually include an item of unearned or phantom freight or require the absorption of freight with the consequent variations in the seller's net factory prices." The court holds this to be a discrimination prohibited by Sec. 2 (a). The real question for decision, however, was whether Staley was entitled to the benefit of Sec. 2(b) by reason of the contention that they adopted the pricing system of Corn Products in order to meet

competition. The court stated (324 U.S. at page 753, 65 S.Ct. at page 974, 89 L.Ed. 1338): "In the Corn Products Refining Company case we hold that this price system of respondents' competitor in part involves unlawful price discriminations, to the extent that freight differentials enter into the computation of price, as a result of the selection as a basing point of a place distant from the point of production and shipment." This seems to make it perfectly clear that the court was solely concerned with a system of pricing predicated upon a basing point other than that of actual shipment.

Staley had no basing point of its own but utilized the discriminatory system of Corn Products which the court held refuted its claim that it did so "in good 'faith" to meet an equally low price of a competitor. The court further made this pertinent observation (324 U.S. at page 757, 65 S.Ct. at page 976, 89 L.Ed. 1338): "We cannot say that a seller acts in good faith when it chooses to adopt such a clearly discriminatory pricing system, at least where it has never attempted to set up a non-discriminatory system, giving to purchasers, who have the natural advantage of proximity to its plant, the price advantages which they are entitled to expect over purchasers at a distance."

Staley, like Mill B in the Commission's hypothetical illustration, sold its product from a competitor's base rather than a base of its own, and thereby deprived its home customers of the price advantages which they were entitled to over purchasers at a distance. Suppose Staley had sold from its own base, as do Mills A and C in the Commission's hypothetical illustration, adding actual freight to points in the territory where it had a freight advantage and absorbing freight necessary to meet competition in other territories. The court in its opinion said nothing which even indicates that such action on the part of Staley would have been discriminatory. In fact, the court disclaimed any such purpose when it stated (324 U.S. at page 757, 65 S.Ct. at page 976, 89 L.Ed. 1338): "But it does not follow that respondents may never absorb freight when their factory price plus actual freight is higher than their competi-

tors' price, or that sellers, by so doing, may not maintain a uniform delivered price at all points of delivery, for in that event there is no discrimination in price."

Thus the court recognized that a seller may absorb freight when done in good faith to meet an equally low price of a competitor, even though a uniform delivered price at all points of delivery might result. That the remedy invoked against Staley may be appropriate against Mill B in the Commission's hypothetical illustration furnishes no basis for the application of the same remedy against Mills A and C, or against any of respondents who occupy a like status.

### What Is a Multiple Basing Point System of Pricing?

We suppose that in every unlawful conspiracy the subject matter thereof must at some stage of the proceeding, either in the charge or otherwise, be described. The complaint contains no definition of the system of pricing which the Commission seeks to outlaw. The findings leave us in doubt as to the essential elements of the system which forms the basis of the conspiracy charged.

The Commission's brief does not dispel but rather increases the doubt as to what the respondents agreed to do as a result of the conspiracy charged. Again the Commission fails to take a clear-cut stand but vacillates between a system which merely permits the absorption of freight and one which requires the collection of phantom or fictitious freight. It states, with reference to the latter: "While this illogical and oppressive condition is a by-product of petitioners' [respondents'] basing point system, it is also inherent in it." We understand this to mean that phantom freight is an inseparable part of the system condemned. This places the Commission in a rather awkward position in view of finding 7 (b) that each mill is free to be or not to be a non-base mill "for reasons its management considers sufficient." As already shown, comparatively few of respondents sell from a non-base mill and collect phantom freight. Suppose all of respondents were base mills, as they might be in the exercise of their independent judgment, would

they then be using the system of which the Commission complains? Notwithstanding the Commission in its brief contends that phantom freight is an "inherent" element of the system charged in the complaint, counsel for the Commission in oral argument, in response to the conceded fact that all of the Pacific Coast respondents are base mills and collect no phantom freight, stated: "I contend, and I shall show a few minutes later, that the existence of phantom freight is not a necessary element in the multiple basing point system at all."

Referring to the term "basing point," the Commission states: "It has meaning only because it correctly implies that the place of actual shipment may not be the basing point." We understand this statement to mean that a basing point system would be innocuous if all respondents sold cement from a base located at the actual point of shipment, which a great majority of respondents do and which all could do if they so desired. The Commission, referring to non-base mills, states: "The maintenance of petitioners' [respondents'] basing point system calls them into being and demands their application wherever a nonbasing point mill has customers to which there is no freight or to which the actual freight is less than the freight factor included in the delivered price quotation." How a system calls non-base mills "into being and demands their application," in view of the Commission's concession that each respondent is free to establish a base or non-base mill "for reasons its management considers sufficient," we are unable to comprehend.

The Commission almost in the next breath states: "Basing point mills are in a somewhat different position. The system does not require them to charge phantom or fictitious freight for geographic reasons as the nonbase mill does. * * * But the system does require that base mills shrink their mill nets as they go into territory where delivered price quotations are governed by another basing point." This is another exaggerated contention. Of course, the system does not require a base mill to charge phantom or fictitious freight; in fact, it does not permit such a charge, and the record demonstrates conclusively that it was not charged by respondents who price from a point of actual shipment.[5] Neither does the system "require that base mills shrink their mill nets." What it does is to permit the absorption of freight and this at the option of the seller when it desires to sell in territory where it has a freight disadvantage.

The Commission states: "The ability of the nonbasing point mill in its own freight advantage territory to add the freight from the basing point and the requirement that it do so if the system is to be maintained results in the imposition of fictitious freight charges or so-called phantom freight." No doubt the non-basing point mill has the ability to accomplish what is stated, but the significant thing is that there is no "requirement that it do so" because it only becomes a non-base mill in the exercise of its own independent judgment and not as a result of the requirements of a system or a conspiracy between it and its competitors.

The Commission states: "It should be understood that it makes no difference in the results whether particular base prices are set by each base mill with or without direct collaboration and direct collusion with other base mills or with their other competitors." This is a contention born of necessity for, as heretofore shown, there is no finding of agreement or collusion between respondents as to base prices. The Commission continues: "It is the method of pricing by formula that produces the identity of delivered price quotations." This is a significant statement and apparently means that it is immaterial whether the identity of delivered price quotations resulted from the conspiracy charged or from independent action.

The Commission states: "Petitioners' [respondents'] system includes the systematic imposition of phantom freight as in the Pittsburgh Plus and glucose cases."

---

[5] There are two minor exceptions to this statement. A small number of respondents with water transportation available and with a lesser freight rate shipped by water but charged the regular rail rate, thereby collecting phantom freight. Also, certain of the respondents delivered by truck but charged the rail rate which was higher, and by this means collected phantom freight.

Here again it appears the Commission is contending that non-base mills with their phantom freight are an essential element of the system condemned. Obviously, however, the conspiracy charged did not refer to a system which "includes the systematic imposition of phantom freight" in view of the conceded fact that each respondent had absolute freedom in determining whether it would become a non-base mill.

It is our view that respondents who have their own base mill and make a price predicated solely thereon are following a trade practice or policy essentially different from the non-base mill which predicates its price upon some base other than the point of actual shipment. Of course, we suppose that these two policies could be united in a common pricing system but this would require an agreement as to which were to be base and which were to be non-base mills, or an agreement that some agency such as the Institute should have the power to specify the class each mill should be in. But there is no such agreement and no such power vested in the Institute. In fact, the contrary situation appears from the Commission's finding that each mill was free to make its own choice as to whether it would become a base or non-base mill.

Other statements contained in the Commission's brief are pertinent to note. One of its favorite themes is that the basing point system operates to nullify the natural advantages and disadvantages of location of the respective mills when quoting in a given territory. The Commission states: "Under any kind of pricing method every mill has a substantial and naturally inherent advantage when quoting on nearby business in real competition with more distant mills. By the same token every mill has a substantial and naturally inherent disadvantage when quoting on distant business in competition with mills located nearer to the customer." This appears to be a logical statement but the question immediately arises as to how the Commission proposes to give effect to this "naturally inherent advantage" and this "naturally inherent disadvantage." As we have already shown, it proposes to make supreme the advantage of a mill selling in the territory where it has a freight advantage, and to make its

disadvantage so great when selling in a competitor's territory as to practically preclude it from entering that market. In fact, the advantage and disadvantage would no longer be natural but artificial, effected by the requirement that each mill sell on an f.o.b. mill price. The change from the present system to one conforming with the Commission's order would be like jumping from the frying pan into the fire.

The Commission, referring to varying mill nets, states: "They are the alter ego of the basing point system of identical delivered price quotations. When gears in a machine mesh that neatly, we may be sure someone planned it that way." The Supreme Court in the old Cement case failed to comprehend this contention. The court stated (268 U.S. at page 598, 45 S.Ct. at page 589, 69 L.Ed. 1104) : "The use of basing points * * * appears not to have been the result of any collective activity on the part of defendants or cement manufacturers generally, nor were they arbitrarily selected. Their use is rather the natural result of the development of the business within certain defined geographical areas. When a manufacturer establishes his factory at a given point of production and sells his product in a territory which is contiguous freightwise to his factory, other mills established in the vicinity and serving the same territory, *in order to compete in that territory* [italics ours] * * * must sell at a mill price which will permit them to deliver cement at a price which will enable them to compete with the mill or mills located at the basing point * * *." If it be assumed, as the Commission argues, that "someone planned it that way," who did the planning? Certainly it was not the present respondents because, as shown by the findings heretofore noted, the pricing system had long been in use prior to the inception of the conspiracy now charged and it "is self-perpetuating."

### Price Leadership.

Another feature of the pricing system under attack greatly emphasized by the Commission is that certain mills are recognized as price leaders. The Commission states: "The base price of course is announced by the base mills. Unless these mills are

recognized as price leaders and their base prices accepted, adopted, and woven into the price structure by their competitors, there can be no basing point system. * * * Base mills can set whatever base price they think best, subject only to preservation of their accepted leadership and the general wisdom of their action. * * * The effect of this situation is that each base mill has an area in which its base price is supreme and recognized as such by its competitors who do business therein." This contention is consistent with finding 6, which divides the respondents into four classes, one of which is "other respondents [not named] have been mere followers." While perhaps this contention is valid theoretically, we think it is applicable to any pricing system and especially that which the Commission would impose. Certainly under any system each producer could determine the price at which its product was to be sold and such price would be supreme in its own territory, irrespective of what its competitors might do or think.

We would think that in all forms of industry, particularly those of great magnitude, irrespective of the pricing system employed, that there would be found price leaders and price followers. We would suppose further that the leaders are those who occupy a commanding position, perhaps because of their size and strength, and that the followers would be those of less vitality. It may be a fact, we suspect that it is, that a price follower does not become such of his own free choice but that he is forced into such a position by a larger and perhaps dominating competitor. And it may also be a fact, again we suspect that it is, that in many instances those who are capable of exercising price leadership impose upon their less fortunate competitors. If such be the case, however, we do not see how this could create any inference of conspiracy or concerted action between the two groups, and neither do we see how it has any bearing upon the pricing system under attack.

In fact, it has been held that one may follow the price leadership of another without imposing any restraint on competition. In United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 748, 754, 71 L.Ed. 1302, the court stated: "And the fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination. [Citing old Cement case.]" In United States v. Standard Oil Co. of New Jersey, D.C., 47 F.2d 288, 316, the court stated: "While it is not the subject of direct evidence, yet it is fairly inferable from the situation shown by the evidence that, if the major companies follow the Socony prices in this area, they do so because they do not wish to engage in a price-cutting war which might entail losses to all concerned (including Socony) without any compensating benefits. Such a view has no sinister aspect, but is merely a matter of business judgment and prudence illustrated in every community in the country by retail competitors in all lines. [Citing many cases, including the old Cement case.]"

### Involuntary or Punitive Bases.

Closely related to price leadership is the Commission's contention concerning the use of involuntary or punitive bases by certain of the respondents. This is the nearest approach the Commission makes to a showing of any power for enforcement of the pricing system under attack. Finding 10 (a) states that some producers "cannot resist the temptation to break away from the system in seeking particularly attractive business. This has occurred, and the departures have probably been more frequent among price followers. Successful maintenance of the system requires, therefore, that the price leaders, usually the larger chain mills, possess the power to force recalcitrants to adhere to the system and that this power be exercised when necessary. The multiple basing-point delivered-price system has inherent within itself means for enforcing its observance. One producer can, by putting a base price into effect at the mill of another producer, absolutely fix the maximum mill net of that producer, usually without affecting the mill net on more than a portion of his own business. . * * * In practice, punitive bases have frequently been lower than the base price of the seller imposing them. * * * Some of the lead-

ers of the cement industry have not hesitated to use this instrument to force adherence to the pricing system used in the cement industry." Then follows in findings 10(b) to (g) a narration of certain instances where punitive bases have been imposed and the effect or result achieved thereby. Many of the instances thus related occurred in 1931 and 1932, when a majority of respondents were not members of the Institute.

We need enter no discussion of the explanation offered by certain of the respondents for the imposition of these so-called punitive bases. The significant fact is that there is no finding that they were imposed as the result of agreement among the respondents through the Institute or otherwise. As the finding recognizes, this power was possessed by price leaders, "usually the larger chain mills."

The Commission argues that the imposition of punitive bases is inherent in the system because "the price leadership of base mills is implicit in the basing point system." We have already shown that price leadership is implicit in any pricing system. It inevitably exists where one or more members of an industry occupy a commanding position because of their strength and magnitude. To illustrate, Mill A, solely because of the power it possesses as a result of its commanding position in the industry, imposes a punitive base upon Mill B for the express purpose, we will assume, of requiring B to sell on a price level satisfactory to A. This is done, of course, without agreement between A and B, because if there was such an agreement the imposition of the punitive bases would be unnecessary. B is unwilling and perhaps unable to resist the price base imposed by A. If B desires to continue in business it has no choice other than to recognize the price base as determined by A. It becomes what the Commission terms a price follower. In doing so, it "does not establish any suppression of competition or show any sinister domination." United States v. International Harvester Co., supra, 274 U.S. at page 708, 47 S.Ct. 754, 71 L.Ed. 1302. More than that, the situation cannot create any inference of an agreement or concerted action between A and B. But even if it did, such inference could not be indulged in against other producers or the Institute, all of which are without power to require or prevent either A or B from acting as they did.

### Uniformity of Delivered Price.

The Commission makes much of the fact that cement is sold at all points of destination at an identical price and particularly that bids to the government have oftentimes been made in identical amounts, as proof of the combination charged. It should be remembered in this connection that the combination alleged is the employment of the basing point price system which results in identical delivered prices. We think we have heretofore demonstrated that the same result would ensue as the result of any pricing system and whether used individually or in combination.

The Commission's argument in this respect is predicated in the main upon the testimony of economic experts given in response to hypothetical questions. We have read this testimony and we must admit that it leaves us in a badly confused state of mind. More than that, the findings predicated thereon are almost as confusing. The Commission does not take issue with respondents' contention that this expert testimony cannot be relied upon as proof of the combination charged. The Commission, however, does place much reliance upon it as showing that the effect of identity of delivered prices is a restraint on competition.

Finding 22 (b) purports to state in broad outline the theory of such witnesses as presented by the respondents, and on the other hand the theory of such witnesses as presented by the Commission. Finding 22 (c) states the conclusion of the Commission predicated upon this economic testimony. It states: "It is concluded that, in the circumstances present in this proceeding, the recognized principle of economics that uniformity of price tends to result from free competition in the case of a standardized article sold to well-informed buyers does not serve to explain the identical delivered prices of respondents in the offering for sale and sale of

cement." This, as we understand, is a recognition that there is a theory of economics as contended for by respondents that uniformity of price will result from the sale of a standardized article sold to well-informed buyers, but we are informed the theory is here without application, notwithstanding the undisputed fact that buyers of cement will not pay more for one brand than another.

The finding continues: "There is a well-recognized principle of economics that in the sale of units of equal desirability the seller will not accept less from one buyer than from another. Under the price pattern heretofore set out in detail, many of respondents' sales have the characteristics of 'dumping.'" The application of this principle would require each mill to sell cement to all customers at a uniform price and would preclude any variation in the mill net. It would follow that freight absorption, in order to meet the price of a competitor, would be prohibited, the effect of which would be to nullify Sec. 2(b) of the Clayton Act. This finding continues: "It is also true that uniformity of price in a given market is equally consistent with a condition of free competition or with a condition of monopoly." Having conceded that uniformity of price in a given market is as consistent with free competition as with monopoly, we do not understand how it can be logically argued that there is no free competition in the sale of cement, perhaps the most standardized product of all.

█ This finding, however, concludes: "When—as in the sale of cement—the price is established by the seller, the price leadership of the governing base mill is accepted by other sellers and there is no bargaining between buyers and sellers, fundamental requirements of a true market in the economic sense are lacking, and prices are not the result of market action in a true economic sense but merely expressions of a noncompetitive or monopolistic price structure." As heretofore shown, the Commission also relies upon this statement as proof of the combination charged. Due perhaps to our inability to grasp the meaning of the statement last quoted, we think it is worthless on any phase of the Commission's case. Is there any standardized product where the price is not established by the seller? And is there any "bargaining between buyers and sellers" in the sale of any standardized product? Can it be that in the sale of standard products generally, with their uniformity of price, there is bargaining between buyers and sellers but that in the sale of cement an exception must be recognized? Does it mean that competition is eliminated when a producer of cement follows the price leadership of another? If so, does it mean that competition can only exist by ignoring such leadership? We think these questions furnish their own answers. Furthermore, we think the statements contained in this finding are so argumentative and inconsistent as to be entitled to little if any weight as a finding of fact.

As shown, the finding recognizes a "principle of economics that uniformity of price tends to result from free competition in the sale of a standardized article sold to well-informed buyers," but further finds this principle is not applicable to the sale of cement. This principle of economics was not only recognized in the old Cement case but given application. The court stated (268 U.S. at page 605, 45 S.Ct. at page 592, 69 L.Ed. 1104): "A great volume of testimony was also given by distinguished economists in support of the thesis that, in the case of a standardized product sold wholesale to fully informed professional buyers, as were the dealers in cement, uniformity of price will inevitably result from active, free and unrestrained competition; and the government in its brief concedes that—'Undoubtedly the price of cement would approach uniformity in a normal market in the absence of all combinations between the manufacturers.'" See also the Staley case, supra, 324 U.S. at page 757, 65 S.Ct. at page 976, 89 L.Ed. 1338.

The Commission attempts to escape the devastating effect of the application of this recognized theory by arguing that "dealers, who are the backbone of the industry, are not well enough informed to know that so-called standard cement is not a homogeneous product and that there are sub-

stantial differences in the quality of such cement." Here again the Commission's contention is directly in conflict with the views expressed in the old Cement case. Furthermore, we are of the view that it borders on the absurd to argue that buyers of cement will not pay more for one brand than another because of their ignorance as to its character and quality. The great bulk of cement is used by both governmental agencies and individuals in the construction of buildings, bridges, highways and projects of a similar nature. Is it within the realm of possibility that dealers, contractors, engineers and others experienced in the use of cement would be, unaware of a difference in quality which would make one brand more desirable than another?

The Commission, however, has made a finding upon which this escape argument is predicated. Finding 20(h) states: "In general, dealers and ordinary purchasers are not aware of differences in quality among the brands of cement sold by different producers. The possession of such knowledge by these groups would tend toward making it impossible for respondents to maintain uniform prices for cement." While the Commission refers to this finding at numerous points in its brief, it nowhere cites any evidence in its support.

Respondents assert there is none, and call our attention to what they contend is the only relevant evidence in the record. At the point suggested it is shown that a dealer witness testified that he was aware of the variations in strength of different brands of cement but even so he would not pay a penny more for one than another. When it was suggested that respondents proposed to call a number of dealer witnesses who would give similar testimony, counsel for the Commission stipulated that "if other dealer witnesses were called they would give their testimony to the same effect." Under the circumstances, we must conclude not only that the finding is without support but that it contradicts the only evidence on the subject. With this finding eliminated, there is no basis for the Commission's contention that the uniformity of a delivered price was any evidence of collusion between sellers or that any restraint on competition was thereby effected.

Pursuing further this matter of uniform price (the Commission calls it identical), finding 9 describes a number of instances where groups of respondents made uniform bids to governmental agencies. Some of such bids were made on a basis of commercial freight rates, others on land grant rates. While the Commission contends that an identical delivered price at any point of destination and an identical price bid to a government agency is evidence of collusion, it does not contend that the inference to be drawn is any different in one instance than the other. The Commission states: "The reciprocal character of the arbitrary and inequitable features of the system may be seen also from a consideration of some of the bids to State highway purchasing officials. It is worthy of note that these bids reflect ordinarily the same prices that are applicable to dealers at the same destinations."

A striking illustration which the Commission asserts is typical concerns bids submitted on 6000 barrels of cement to the United States Engineer Office at Tucumcari, New Mexico, opened April 23, 1936, wherein the delivered price bid by each was $3.2865854 per barrel. That these identical bids necessarily were the result of collusion is more fanciful than real when it is further disclosed that the land grant freight rate to which the government was entitled from the nearest mill of the eleven bidders was $1.1865854 per barrel. Assuming that the bidders had knowledge of this land grant freight rate, it would not require an agreement but merely the application of a simple formula in arithmetic to determine the amount of the bid which would probably be made by the mill most advantageously located. And if the other mills expected to obtain any part of the award, it would be necessary for them to meet such bid. In doing so, some of them and perhaps all would be required to absorb such freight as would enable them to meet the anticipated bid of the one having the advantage freightwise. So the uniformity of price to a gov-

ernment agency at any point of destination presents the same legal problem as the identity of price to private customers, that is, whether a producer may in good faith absorb freight to meet an equally low price of a competitor.

In connection with these identical bids to governmental agencies, as well as an identical selling price at any given point of destination, it is well to keep in mind, as heretofore shown, that the Commission also found (9(e)) that there was no exchange of price information between the corporate respondents, through the Institute or otherwise. Furthermore, the record discloses that it was a common practice of governmental agencies when advertising for bids to insert a provision that the bid was not to exceed the current price of cement at the point where the government required delivery. Governmental agencies were primarily concerned in protecting the government from paying more for cement than the current price at any particular time and point of destination.

In connection with the argument on identity of delivered prices, the Commission makes the following significant statement: "Forty-six of petitioner manufacturers included in their answers to the complaint a statement of their assumptions with reference to the manner of ascertaining the prices not only which have been but 'which may be quoted by his competitors for delivery at the same destinations': The producer assumes that pursuant to long-established trade usage each of his competitors will normally calculate his destination price by the same simple process that he himself uses. The producer can usually determine the prices used by his competitors in calculating their own destination prices by subtracting known transportation rates from several known destination prices of any given competitor."

The only answer which the Commission makes to the contention thus stated is: "This description of course is applicable only to base prices of base mills," which in reality is no answer for the reason that a great majority of respondents' mills are base mills and all are free to become such if they so desire.

As already shown, buyers will not pay more for one brand of cement than another. Of course, it must be true, as the Commission asserts, that it does not follow but that they would like to pay less. If, however, one seller made a less price all others selling at the same point would "almost immediately" learn of this fact and be compelled to reduce their price accordingly or abandon the market. If they pursued the former course, the price at that point would again become uniform, or, in the language of the Commission, identical.

Under the circumstances shown, we think it is the inevitable result of any pricing system that cement must be sold at the same place at a uniform price whether it be at the point of production or that of destination. Suppose the Commission's order becomes effective, can it be doubted that the plant price of cement of producers located in the same area will be uniform? If one producer persists in selling for more than the others, his customers will be lost. If he sells for less, the others will be compelled to lower their price to the same level, or forego the business. Further, if they sell at a uniform price it will immediately create, according to the Commission's theory, an inference that they are acting in collusion.

■ Assuming, however, that an identical bid by a group of producers creates an inference of collusion, against whom is that inference to be directed? To illustrate, suppose the government advertises for bids on three projects, one in the New York area, one in the Midwest, and another on the Pacific Coast. A group of respondents bid an identical price on the New York project, another group an identical price on the Midwest project, and still another group an identical price on the Pacific project. This identity of bids only applies to members of each group; there is no identity of bids as between groups. The Commission's view is that such identity of bids creates an inference not only against the bidders in each group, not only against the three groups, but against all members of the industry. We do not agree. In our judgment, any inference must be

confined to members of the group responsible for such bids.

In this connection, it is pertinent to note the recent opinion of the Supreme Court in the cases of Kotteakos and Lekacos v. United States and Regenbogen v. United States, 66 S.Ct. 1239, wherein a judgment of conviction in a conspiracy case was reversed because the proof showed a number of small conspiracies rather than the general conspiracy charged. True, that was a criminal conspiracy but we know of no reason for the application of a different rule insofar as the point now under discussion is concerned. The court, in commenting upon the instructions of the trial court, stated (page 15, leaflet opinion): "On those instructions it was competent not only for the jury to find that all of the defendants were parties to a single common plan, design and scheme, where none was shown by the proof, but also for them to impute to each defendant the acts and statements of the others without reference to whether they related to one of the schemes proven or another, and to find an overt act affecting all in conduct which admittedly could only have affected some."

### Freight Rate Books.

In the early part of this opinion we enumerated certain practices charged in the complaint as methods employed for making the multiple basing point price system effective, oftentimes referred to by the Commission as acts of implementation. These methods and acts, as found by the Commission, were employed by groups of respondents, some by one group and some another. None, so far as we are aware, was used by all. They are what are known in the law of conspiracy as overt acts and their materiality depends upon the establishment of the conspiracy alleged.

Inasmuch as we conclude that the Commission has failed to establish the unlawful conspiracy charged, it appears unnecessary to enter into any detailed discussion of the methods asserted to have been used for the purpose of making the system effective. Typical of such methods and the one perhaps of greatest importance from the standpoint of the Commission was the publication by the Institute and the use by some of the respondents of freight rate books which contained the railroad freight rates from many points of shipment to those of destination. Finding 8(g) states: "The Institute rate books have regularly been used for pricing purposes, either directly or indirectly, by most of the corporate respondents located in territory covered by the rate books * * *." It will be noted that this finding is indefinite as to which of the respondents used these rate books. The fact is that it was never used by many of the respondents, including all those located on the Pacific Coast. The finding concludes: "The use of Institute freight rate books was not limited to members of the Institute; nonmembers were permitted to, and some did, purchase rate books from the Institute." The record also discloses that the rate books were not only available to members of the industry but to any member of the public who cared to purchase the same, also that freight rate books had long been in use by the industry prior to the beginning of the alleged conspiracy now relied upon. In fact, it was one of the important matters considered in the old Cement case. It is also material to note that the basing points from which the freight rates were calculated were not selected by the Institute, and each member of the Institute was free to use or not use this freight rate service.

The chief criticism directed at these books is that they failed to show the actual freight rate. This is explained, however, from the fact that the freight rate on cement as established and furnished by the railroads was so much per hundred pounds. Cement is handled and sold largely by the barrel, so in the preparation of these books either the Institute or persons acting under its direction converted this rate per hundred pounds to a rate per barrel. In doing so, the fractions of a cent were ordinarily dropped, so in some instances the rate shown would be a fraction of a cent more and in other instances a fraction of a cent less than the actual rate.

The court in the old Cement case, concerning the use of such rate books, stated (268 U.S. at page 597, 45 S.Ct. at page 589, 69 L.Ed. 1104): "The basing points from which freight rates were calculated were

not selected by the association, but were the same as those appearing in prior books published by individuals before the publication of the association freight rate book. * * * The rates published are the actual rates omitting fractions of cents between the basing points and actual points of delivery." The court continues (268 U.S. at page 598, 45 S.Ct. at page 589, 69 L.Ed. 1104): "In order, however, to determine the delivered price, there must be added to the factory price of a given manufacturer, the cost of transportation to the point of delivery. Prompt quotation of a delivered price therefore involves the ability to carry out promptly the mechanical process of adding to the mill price, the cost of transportation to the point of delivery. Lists of freight rates, in convenient and readily available form, are therefore necessary adjuncts to the quotation of delivery prices for cement."

### The Cases.

In the previous discussion, we have frequently referred to the decision in Cement Mfrs. Protective Ass'n. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (referred to as the old Cement case to distinguish it from the instant case), and have indulged in quotations therefrom. The Commission makes little if any effort to distinguish that case from the one before us but contends that the decision there was wrong, that the court had foisted upon it a theory unsound both from an economic and legal standpoint. That may be a valid argument to make to the Supreme Court but it is hardly in place here. On the other hand, it is insisted by respondents that the decision in that case is res adjudicata or at any rate stare decisis of the instant situation. We think we need not discuss or decide this contention. If the reasoning of that decision is applicable, as we think it is, we must accept rather than repudiate it.

In view of the length of this opinion, we must forego a review in detail of the facts of that case, as well as the court's reasoning. In addition to what we have heretofore said, it may be observed that it was an action by the government against a trade association and 19 corporate members thereof engaged in the manufacture of cement (such corporate members are also respondents in the instant case), who were charged with a violation of Sec. 1 of the Sherman Act. 15 U.S.C.A. §§ 1–7, 15 note. It appears material to know just what the charge in that case was as compared with the charge here. The court states (268 U. S. at page 592, 45 S.Ct. at page 587, 69 L. Ed. 1104): "The activities of defendant, on which the government bases its case for an injunction, may summarily be stated as follows: The government charges that the defendants, through the activities of the association, control prices and production of cement within the territorial area served by the several defendants in the following manner * * * [describing numerous trade activities relied upon]." The court continues: "The government asserts that uniformity of prices and limitation of production are necessary results of these activities of the defendants. It does not, however, charge any agreement or understanding between the defendants placing limitations on either prices or production." In the instant case, the Commission charges "a combination among themselves to hinder, lessen, restrict and restrain competition in price, among producing respondents * * * made effective by mutual understanding or agreement to employ, and by the actual employment of * * * what is known as a multiple basing point system of pricing," which results in the quoting of identical prices by all producers who seek delivery at any given destination.

As we have already shown, there is neither charge nor finding in the instant case that respondents entered into any agreement to fix prices either at the mill or at the point of delivery. The combination is to restrain competition in a certain manner, that is, by the employment of the multiple basing point system of pricing, and the effect on prices, as charged, is that which flows from the use of such system.

In summarized form, the Supreme Court found nothing wrong with the use of the basing point system, the absorption of freight in order to compete in a freight disadvantage territory, even though it resulted in a uniform delivered price, and further, that a uniform delivered price resulting from the use of such system did not consti-

tute a restraint on competition under the Sherman Act.

We have studied subsequent decisions of the Supreme Court with a view of ascertaining whether the holding in the old Cement case has been altered or modified and we think that it has not. It has been distinguished in such cases as United States v. Trenton Potteries, 273 U.S. 392, 400, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 217, 60 S.Ct. 811, 84 L.Ed. 1129, on the basis that there was not present in the old Cement case an agreement for price fixing. A more important case perhaps is that of Sugar Institute, Inc. v. United States, 297 U.S. 553, 56 S.Ct. 629, 638, 80 L.Ed. 859. This was another price fixing case under the Sherman Act, against a trade association and its members. While the opinion discloses that members of the industry "sold in areas enjoying lower freight rates from other refineries by paying or absorbing part of the transportation charges," no fault appears to have been found with this method of pricing. The emphasis throughout the court's opinion is upon "the restrictions actually imposed through the Institute," "policing," "recommendations of the Institute, concertedly observed," "obligation to adhere," "rigid enforcement," and "steps taken to secure adherence." As heretofore shown, there is no finding in the instant case that the Institute had any power or authority to enforce its recommendations or to penalize or discipline any members for failure of observance, and no finding that the Institute had anything to do with the fixing or maintenance of prices.

This brings us to a further consideration of the Corn Products case, which is the latest decision of the Supreme Court and we think the most important relative to the issues presented in the instant case, and particularly whether the court has modified or retracted its holding in the old Cement case. It is pertinent to note that the late Chief Justice Stone was the author of the opinion in both cases.

Referring to the Maple Flooring case and the old Cement case, the court stated (324 U.S. at page 735, 65 S.Ct. at page 966, 89 L.Ed. 1320): "The only question for de-cision in those cases was whether there was a concerted price-fixing scheme among competing sellers, accomplished in part by their adoption of a uniform basing point system; in fact, no prohibited concert of action was found." True, in the instant case concert of action was found, but such finding is predicated largely upon the concurrent use of the system by respondents, which the court in the old Cement case thought was no indication of conspiracy. The court in the Corn Products case on the same page continued: "In the Maple Flooring case, supra, the single basing point was so close to most of the points of production as to result in but trivial freight variances; and the defendants in that case were willing to sell on a f. o. b. mill basis, whenever the purchaser so requested." In the instant case, there is no finding of a refusal on the part of respondents to sell on an f. o. b. mill basis; in fact, the record discloses that many of them did so.

The court on the same page continued: "In the Cement case, supra, the defendants used a multiple basing point system, with a basing point at or near each point of production. Under this system, any manufacturer, in order to compete in the territory closer freightwise to another, would absorb freight, by adjusting his mill price to make his delivered price as low as that of his competitors. Under this system the delivered price for any locality was determined by the nearest basing point." Of course, the court in the Corn Products case was not called upon to decide whether the use of the multiple basing point price system was in restraint of competition, as is charged in count 1 of the instant complaint and which it decided adversely to the government in the old Cement case. However, we think it is clear that the court referred approvingly to its previous decisions in the Maple Flooring and old Cement cases, and certainly there is nothing in the language quoted or otherwise which indicates an intention to modify or retract what it had previously held in those cases.

As heretofore noted, the issue in the Corn Products case was whether a violation had been shown under Sec. 2(a) of the Clayton Act as amended by the Robinson-Patman Act. We think it is an argu-

able question whether the opinion is authority for the Commission's conclusion in the instant case that a violation of the same section as charged in count 2 of the complaint has been shown. In that case the product involved was glucose, concerning which the court stated (324 U.S. at page 734, 65 S.Ct. at page 965, 89 L.Ed. 1320): "The purchasers of glucose from petitioners are found to be in competition with each other, even though they are in different localities. The injury to the competition of purchasers in different localities is no less harmful than if they were in the same city." Again the court stated (324 U.S. at page 738, 65 S.Ct. at page 967, 89 L.Ed. 1320): "Since the cost of glucose, a principal ingredient of low priced candy, is less at Chicago, candy manufacturers there are in a better position to compete for business, and manufacturers of candy located near other factories producing glucose, distant from the basing point, as Kansas City, are in a less favorable position. The consequence is, as found by the Commission, that several manufacturers of candy, who were formerly located in Kansas City or other cities served from petitioners' Kansas City plant, have moved their factories to Chicago."

Thus the discrimination harmful to competition was between the purchasers of glucose wherever located. This was because glucose was used by candy manufacturers as the principal ingredient of candy which was sold and shipped by such manufacturers to all parts of the country. In contrast to the product involved in that case, we are here concerned with cement which is used largely in the construction of permanent structures. Such being the case, it is difficult to discern how there could be any competition, for instance, between purchasers of cement in Chicago and those in Kansas City. In this connection it should be kept in mind that the discrimination here asserted is between customers of the same seller located at different points and not between customers located at the same point or between those of different sellers.

We have heretofore discussed the Corn Products and Staley cases as they throw light upon the right of a base mill to absorb freight in order to meet the equally low price of a competitor under Sec. 2(b) of the Robinson-Patman Act, and need not repeat our discussion in this respect. It certainly cannot be said, as argued by the Commission, that the court held such practice illegal. On the other hand, we think these cases taken together indicate an approval of such practice.

The Commission also relies strongly upon the recent decisions of this court in United States Maltsters Ass'n v. Federal Trade Commission, 7 Cir., 152 F.2d 161, and Milk & Ice Cream Can Institute et al. v. Federal Trade Commission, 7 Cir., 152 F.2d 478, in support of its contention that identical delivered prices are evidence of conspiracy or concerted action. We need not discuss these decisions any further than to point out that in each of those cases a conspiracy to fix prices was charged and found. The multiple basing point price system was not directly involved in either case. In other words, the conspiracy was to fix prices and not merely to use a system from which uniformity of price resulted, as in the instant case and the old Cement case. Moreover, the Commission in those cases did not rely upon what was done by one group at a certain time and place and by some other group at another time and place in support of the charge of conspiracy. The respondents in each of those cases were all engaged in the same activities. In other words, they were acting in unison. Those cases are also distinguishable in numerous other ways not necessary to discuss.

We therefore are of the view there is nothing in any of the cases decided subsequent to the old Cement case which in any way changes or modifies the holding that no restraint on competition was effected by use of the basing point price system. As shown under the Corn Products and Staley opinions, its use under the Clayton Act as it relates to freight absorption remains an open question with an indication that such use is permissible.

We have not considered the record in this proceeding for the purpose of ascertaining what may be wrong with the methods and practices of the cement industry, other than those relevant to the issues for decision. The record may and perhaps does disclose methods and practices by

some of the respondents which are prohibited. Assuming, for instance, that there is no justification for the practice of collecting phantom freight, whether by a non-base mill which sells and delivers cement from a point other than that of shipment, or by a mill which ships by water and charges the higher rail rate, or by a mill which delivers by truck and charges the higher rail rate, it does not follow that members of the industry who do not and never have followed such illegal practice are members of a conspiracy to effect its utilization. And there may be other practices shown, such as identical delivered bids, which give rise to an inference of concerted action among those responsible therefor, but even so, this is a far cry from the combination here alleged. Undoubtedly the Commission has the authority to proceed against those whose methods and practices are illegal, but such authority affords no justification for the instant proceeding directed indiscriminately at all the members of the industry, good and bad alike.

As we have proceeded with our study of this case, we naturally have become impressed, not only with its magnitude and scope but also with the limitless possibilities and consequences involved. The Commission's order proposes to eliminate the sale of cement on a delivered price basis, notwithstanding the almost unanimous desire on the part of dealers and purchasers that it be so sold. Instead, it would require that cement be sold on an f. o. b. plant basis. Any and all discriminations, and they are calculated to be more numerous and complicated than under the system here condemned, will furnish the basis for contempt proceedings in this court. We are to be made a police force for the purpose of guarding and directing members of this industry wherever located, in a highly technical and complicated field. Before any court gives its assent to such an ambitious program, it should be certain that it is required to do so by the law and the facts.

Furthermore, the basing point price system has been in use by industry for almost a half century. There has been and is a marked diversity of opinion among economists, lawmakers and people generally as to whether it is good or bad. Numerous bills have been introduced in Congress seeking to outlaw its use. Countless time has been spent in hearings by Congressional committees, before whom it has been assailed and defended. The pages of the Congressional Record bear mute but indisputable proof of the fact that Congress has repeatedly refused to declare its use illegal. There is no occasion to relate this Congressional history. It is a matter of common and general knowledge. In the Corn Products case, the court in commenting upon some of this legislative history stated (324 U.S. at page 737, 65 S.Ct. at page 967, 89 L.Ed. 1320): "We think this legislative history indicates only that Congress was unwilling to require f. o. b. factory pricing, and thus to make all uniform delivered price systems and all basing point systems illegal per se." Notwithstanding this Congressional attitude as recognized by the Supreme Court, this court is now urged to hold that the system is illegal per se, and to require that cement be sold on an f. o. b. plant basis.

In our judgment, the question as to whether the basing point price system should be declared illegal rests clearly within the legislative domain. We know of no criticism so often and so forcibly directed at courts, particularly Federal courts, as their propensity for usurping the functions of Congress. If this pricing system which Congress has over the years steadfastly refused to declare illegal, although vigorously urged to do so, is now to be outlawed by the courts, it will mark the high tide in judicial usurpation.

Respondents' motion to adduce additional evidence has heretofore been denied without prejudice to its renewal at the time of a hearing on the merits. Such motion was renewed and it is again denied. During the pendency of the petitions for review a petition was filed by respondent Marquette, alleging that it had been deprived of its constitutional right to due process of law because of the bias and prejudice of the Commission and its pre-judgment of the issues. A hearing was had upon such petition and the relief sought was denied by this court. See Marquette Cement Mfg. Co. v. Federal Trade Commission, 7 Cir., 147 F.2d 589. Marquette

sought again to raise the same question at the hearing on the merits and certain other respondents made a similar attack upon the Commission. For the reasons stated in our former opinion, the relief thus sought is again denied. Certain of the respondents have also made an attack upon the jurisdiction of the Commission for the reason, so it is asserted, that count 1 of the complaint states a cause of action under Sec. 1 of the Sherman Act, 15 U.S.C.A. § 1, and that the Commission is without jurisdiction to enforce such Act. We think we need not discuss or decide the issue thus presented. Certain other respondents contend that the Commission is without jurisdiction as to them because their sales of cement were made solely in intrastate commerce. Again we think the issue thus presented need not be discussed or decided.

The petitions for review of and to set aside the order to cease and desist, issued by the Federal Trade Commission July 17, 1943, are allowed. The said order is hereby vacated and set aside, and a form of decree may be presented to this court in conformity with the conclusion thus stated.

EVANS, Circuit Judge (dissenting).

I am unable to agree with the conclusion reached in the majority opinion.

The instant appeal well illustrates the limitations of an intermediate court like ours. We receive directions from Congress in the form of legislation, as to the wisdom of which we are to make no inquiry. Its field of activity is restricted and limited by the pronouncements of the Supreme Court, whose decisions we must follow. Our duty is thus to ascertain the facts and proceed with the application of those facts to the statutes enacted, in the light of the rulings and directions of the Supreme Court.

This limitation of our judicial functions would seemingly simplify and lessen our task but it apparently has not accomplished the seemingly obvious. This may be due to the size of the record, to the numerous counsel, or to the great number of questions which counsel have raised.

Lack of merit in any of said questions has not prevented their presentation—both at length and with zeal. This is shown by a reading of my associates' opinion, which, though I do not approve of the conclusion reached, does impress me favorably with its earnestness, and the thoroughness of the writer's efforts as well as the frankness and candor he has displayed.

As to the law governing the disposition of the appeal we are fortunate in a wealth of decisions and elaborate discussions which have dealt with the subjects. If I go astray it is not because of lack of light or the absence of precedent.

The following decisions must be our guide:

Cement Manufacturers Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104; Maple Flooring Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Corn Products Co. v. Federal Trade Comm., 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320; Federal Trade Comm. v. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L. Ed. 1338; Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859; also, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; Federal Trade Comm. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534.

Decisions of this court, though not reviewed by the Supreme Court, also call at least for study. Even though lacking the weight of Supreme Court decisions, they are better understood by us for we heard them. Their facts and holdings are like old and familiar faces, once seemingly rather tired and monotonous, but more pleasing and agreeable as we look into them anew, after the lapse of some years:

Corn Products Refining Co. v. Federal Trade Comm., 7 Cir., 144 F.2d 211; Federal Trade Comm. v. Staley Co., 7 Cir., 144 F.2d 221; Milk & Ice Cream Can Institute v. Federal Trade Comm., 7 Cir., 152 F.2d 478; United States Maltsters Ass'n v. Federal Trade Comm., 7 Cir., 152 F.2d 161; Eugene Dietzgen Co. v. Federal Trade Comm., 7 Cir., 142 F.2d 321; Fort Howard Paper Co. v. Federal Trade Comm., 156 F.2d 899; Salt Producers Ass'n v. Federal Trade Comm., 7 Cir., 134 F.2d 354.

In the absence of review by the Supreme Court, the opinions in the Milk Can Institute, the Maltsters Association, and the Fort Howard Paper cases, carry a strong presumption of soundness and validity on the facts there stated as well as the full approval which we are prone to attach to our own holdings unless reversed. Even when reversed, they do not always lose their appeal.

Several questions here presented make the opinion in Eugene Dietzgen v. Federal Trade Comm., supra, particularly apropos. The effect of the invalid N. R. A., the deductions which arise from similarity of prices, and the contention that respondents cannot be prosecuted for violation of the Anti-Trust Act and also subjected to Federal Trade Commission proceedings are there considered and our views thereon expressed.

Without extended discussion, I state the issues involved and my position on them.

1. I agree there has been no deprivation of due process because of the alleged bias of the Commission. Marquette Cement Co. v. Federal Trade Comm., 147 F. 2d 589.

2. I do not believe the practice of "absorption" of freight, in order to meet competition, is necessarily, in all instances, illegal, nor does the Commission so contend.

3. The practice of charging "phantom" freight, at least where substantial, is illegal.

4. The Commission's challenge here lays stress on the agreement to utilize a multiple basing point system rather than stressing illegality of the multiple basing point system per se and its order is correspondingly limited to such asserted illegal agreement.

5. I am strongly impressed with the persuasiveness of the inference of an agreement or a combination or conspiracy to be drawn from consistently identical delivered prices, notwithstanding the product is a standard one. Such inference is strengthened by other facts and circumstances, such as phantom freight, basing points, refusal to abandon the practice of quoting delivery prices only, etc.

6. The "old" Cement case cannot be ignored. The Supreme Court has not expressly overruled it, in the more recent, and somewhat related cases. Neither can I ignore the opinions of the Supreme Court in these later cases. They are the latest expressions of the court and are controlling when it comes to reconciling them with the earlier Cement case. I have endeavored to reconcile the earlier Cement case holding with the later cases, with the result that I accept as the law of the case the holding of the Cement case but only as controlled by the later decisions.

Comparative study of the later decisions with the earlier Cement case opinion indicates a changing trend, but I have attempted to reconcile and accept them all. I can not and do not accept the earlier Cement Opinion unqualifiedly, but only as affected by the later cases.

The instant case is clearly distinguishable from the earlier Cement Opinion, if for no other reason than that no conspiracy was charged in the earlier case.

The instant proceeding is under different statutes. The Clayton Act, here charged to be violated, was amended by the Robinson-Patman Act, after the decision in the Old Cement Case.

The instant proceedings involve different facts. An agreement is the heart of the instant case and was absent in the former case.

7. I do not see any inconsistency in the finding that all mills may choose whether they will be a base or a non-base mill, and the charge of agreement to adhere to a multiple basing point system, nor in the freedom, if a base mill, to set the mill net for the base. As I comprehend the charge, it is that all producers, when selling in any particular territory, adopt that territory's base mill net and add the freight book rate, with the inevitable result of identical or uniform delivered prices by all producers to all purchasers in any particular territory. Competition is thus eliminated. Prices are fixed. Prices are actually determined by the territory's base mill net. The Institute, instead of being an alleged teacher in ethics, is an instrumentality which contributes to the result of a monopoly,—a predeter-

mined, fixed price—by supplying all mills serving that territory, with the freight rates per barrel, which are added to the base mill net. This contribution by the Institute would be harmless in itself, but its innocent character is lost when the use, knowingly made, of its information, is disclosed. It differs in no respect from the criminal conspiracy where one actor (a bank robber) plays an apparently innocent role, but one upon which the whole criminal enterprise depends. Murphy v. United States, 7 Cir., 285 F. 801.

The avowed purpose and the express coverage of the Sherman Act, the Federal Trade Commission Act, the Clayton Act, and the Robinson-Patman Act are thus violated. The concern of these statutes is with the result.

The F. T. C.'s finding of a conspiracy to restrain trade, in my opinion, has substantial support in the record. The following chart of identical bids is a sample of this evidentiary support:

the fact findings of the Commission as to the suppression of competition, but it made any other finding impossible." Or as we also said in the Milk & Ice Cream Can Institute et al. v. Federal Trade Comm., supra [152 F.2d 481], "Just how such an unnatural situation could be brought about by members of an industry without a plan or agreement is difficult, if not impossible, to visualize."

There was other evidence of a conspiracy to restrain trade. Not only was there identity in the bids but there was received in evidence a letter from Mr. John Treanor to officers of respondents and members on the Institute's board and associates on the Code Authority, which refutes respondents' protestations of no conspiracy and no participation therein by the Institute or by the other respondents. Mr. Treanor was president of Riverside and a trustee of the Institute. His statement was an admission of a party to a conspiracy made during pendency of the conspiracy: He wrote:

| No. of Bid | Name of Bidder | Price per Barrel | Discount (days) |
|---|---|---|---|
| 1 | Monarch | $3.28654 | 15 |
| 2 | Ash Grove | 3.28654 | 15 |
| 3 | Lehigh | 3.28654 | 15 |
| 4 | Southwestern | 3.28654 | 15 |
| 5 | Oklahoma | 3.28654 | 15 |
| 6 | U. S. Portland C. Co. | 3.28654 | 15 |
| 7 | Consolidated | 3.28654 | 15 |
| 8 | Trinity | 3.28654 | 15 |
| 9 | Lone Star | 3.28654 | 15 |
| 10 | Universal | 3.28654 | 15 |
| 11 | Colorado | 3.28654 | 15 |

These bids were made by the eleven different companies in response to a request for bids for 6,000 barrels of cement. The eleven bidders made bids which were identical to the ten-thousandth of a cent. Could that be a coincidence? It happened times without number. Could it have happened without agreement or understanding?

This chart is only one of many instances showing identity of bids. Many other instances are set forth in paragraph 9 of the Commission's findings. As we said in the Dietzgen case, supra, in discussing identical bids, "The evidence not only supports

"The worst that can be said is that the economic foundation for some of these discussions of price making is frail. With that opinion I am inclined to agree, believing that no sound defense of our methods of selling cement can be made without the admission that some limitation of competition is necessary in such an industry as cement. This is not a subject which can be presented to the public through advertising, or in any way. It is an argument that has to be made and can be made in special places where it may be calculated to do some good. * * *"

"Do you think any of the arguments for the basing point system, which we have thus far advanced, will arouse anything but derision in and out of the government? I have read them all recently. Some of them are very clever and ingenious. They amount to this however: that we price this way in order to discourage monopolistic practices and to preserve free competition, etc. This is sheer bunk and hypocrisy. *The truth is of course—and there can be no serious, respectable discussion of our case unless this is acknowledged— that ours is an industry above all others that cannot stand free competition, that must systematically restrain competition or be ruined.*"

Further support for the Commission's finding may also be found in the evidence which showed the respondents' refusing to quote prices save at destination points. This standing alone could be accepted as innocent, but in connection with the other evidence it was clearly a part of a plan to eliminate competition. And what is probably more important,— it, with the adoption of the basing points, succeeded in complete and effective elimination of competition. Both unusual and significant is this complete elimination of competition, such as here disclosed.

Counsel may argue that Congress should amend the statutes, so that competition may be eliminated between those who engage in the manufacture and sale of standard articles. Congress has made no such distinction and even if we were agreeable to such a proposal, neither we nor the Federal Trade Commission could revise the anti-monopoly legislation which Congress has enacted. That is a legislative not a judicial task.

What constitutes sufficient evidence to sustain a verdict of a jury or a finding of a court or of the Federal Trade Commission that a conspiracy exists and defendants are parties to it, has been the subject of consideration by appellate courts so frequently that we are not justified in citing the authorities. I will refer to only one where I attempted to state the rule, Allen v. United States, 7 Cir., 4 F.2d 688.

And I will add that it is the Federal Trade Commission and not this court that Congress made the fact finder.

Conspiracies are usually established by circumstantial evidence. Seldom do the offenders make solemn written agreements. While circumstantial evidence may be less persuasive in some cases, it by no means follows that it is necessarily weak or lacking in conviction carrying-power. In the instant case there are facts which are not in dispute and which leave me free from doubt as to the doings of the respondents and of their understanding and purpose to eliminate price competition.

Some of the respondents have argued that the Anti-Trust Acts do not apply to the sale of standard goods. This position I cannot accept. The anti-monopoly legislation was for the purpose of maintaining competition and there may be competition in standard articles just as there is competition between manufacturers of articles not standardized.

Likewise, it is unnecessary to discuss the effect of the basing point system as the basic element in price fixation in the light of what was said in the Corn Products and the Staley cases, supra.

Discussion of the effect of the N. R. A. is unnecessary in view of what we said in the Dietzgen case, supra.

If the evidence fails to show that one or more of the defendants is a party to the conspiracy we should dismiss said defendant from the proceedings. We should not for that reason order the Commission to dismiss the proceeding.